# Barfield v. South Highlands Infirmary, et al.

## Damages for Malpractice.

(Decided January 14, 1915.   Rehearing denied February 4, 1915.
68 South. 30.)

1. *Hospitals; Negligence or Unskilfulness of Treatment; Liability.*
—A hospital corporation was not liable for the negligence, unskill,
or other wrong doing of a surgeon in the treatment of a patient,
although he was a shareholder and officer of the corporation, where
such medical and surgical treatment in the hospital and the operation
was prescribed and performed by the surgeon under independent
employment by the patient.

2. *Deposition; Examination of Witness; Cross-Examination.*—Un-
der section 4032, Code 1907, as amended by Acts 1911, p. 486, when
testimony is desired under subdivision 3 of section 4030, Code 1907,
the party against whom it is proposed to take such deposition, within
the time for filing cross interrogatories, has a right to demand rea-
sonable notice of the time and place of taking the testimony, and
to attend and cross-examine the witnesses orally, where such party
has complied with the terms of the statute, notwithstanding the
meaning of the statute is somewhat obscure.

3. *Appeal and Error; Review; Showing Error.*—The rule is that
error must be affirmatively shown, and such error is not shown with
respect to the suppression of a deposition on a motion grounded,
among other things, on the fact that notice of the time and place
of taking the deposition was not given, where the evidence on the
motion, if any was taken, was not before the appellate court, and
it did not otherwise appear that the deposition was not suppressed
for lack of a compliance with the statute.

4. *Physician and Surgeon; Malpractice; Evidence.*—Where the ac-
tion was against a surgeon for malpractice, a question to a witness
as to the charges made by the surgeon for his treatment, was
properly excluded, the amount of the charge not being in issue, as
the surgeon was morally and legally bound to exercise the same de-
gree of care, diligence and skill, whether his charge was large or
small, and no inference of wrong or negligence arise from the fact
that the charge was unreasonable; his charge being shown by other
evidence.

5. *Evidence; Standard Works; Medical Treatises.*—Extracts from
medical treatises recognized and approved by the medical profession
as standard, if relevant to the matter at issue, may be read to the
jury as evidence.

6. *Same; Expert; Cross-Examination.*—Where the action was for
malpractice, it was proper to permit an expert medical witness to be
asked on cross-examination if it was true, as stated in the medical
treatise of high authority, that it was not uncommon to find gan-

grene developing because of laceration or pressure, even in closed fractures of the femur, and that early amputation of the thigh above the fracture was necessary in those cases, and should be done early in order to save life, since this was but the statement of surgical theory and practice, and the gist of the question was as to whether the witness's expert opinion concurred with that of the medical authority.

7. *Witnesses; Examination; Leading Question.*—Usually and ordinarily, it is within the discretion of the trial court to permit leading questions. especially as to a question whether it was not a fact that "this sort of human disaster" was preventable, since the question led away from and not to the desired answer.

8. *Appeal and Error; Harmless Error; Evidence.*—Where evidence of facts is subsequently offered, any error relative to their exclusion is usually regarded as cured, and while it is better to defer hypothetical questions to expert witnesses until evidence of all the facts hypothesized has been offered, the subsequent admission of all the facts renders the question harmless.

9. *Same; Insignificant Error; Evidence.*—Where plaintiff's evidence contained inferences that from the time she went to the hospital where she was operated on, and was put in defendant's charge she was kept in ignorance of the danger of her condition, and decieved as to the measures that would have to be resorted to to affect her cure. the admission of testimony for defendant, as answering this contention, defendant told plaintiff's mother on the morning she was removed to the hospital, the mother making the arrangements therefor, that he "would not guarantee her, but that he would do all he could for plaintiff," related to a matter of so little significance as not to require a reversal ; especially as it was probably competent in rebuttal of the contention that defendant entered into an agreement or promise to restore plaintiff or save her leg.

10. *Evidence; Experts; Reading; Evidence.*—Where the action was for malpractice on the part of a surgeon, while treating a patient in a hospital, the defendant, while testifying as an expert, and giving his opinion on the whole course of treatment administered to plaintiff, was properly permitted to read temperature charts kept by the nurses in the hospital, the authenticity and accuracy of which was undisputed, such being nothing more than some of the considerations that entered into and influenced his professional judgment respecting the proper treatment to be administered.

11. *Appeal and Error; Cured by Answer; State of Mind.*—Where plaintiff testified that she was ignorant for several days after the operation that her leg had been amputated, if the question to a nurse as to whether plaintiff knew that her leg had been amputated, was improper as calling for witness' knowledge of the state or operation of the plaintiff's mind, her answer thereto that plaintiff would lie there and watch the leg being dressed every time it was dressed, rendered the question harmless, since the witness stated only cognizable facts.

12. *Evidence; Self-Serving Declarations; Malpractice.*—Evidence of declarations made by plaintiff to another physician about the amputation, and what was said between them relative thereto, and whether the witness knew that defendant sent such other physician to tell

[Barfield v. South Highlands Infirmary, et al.]

plaintiff about her condition, was properly excluded as statements made or things enacted in the absence of defendant, and not brought to his knowledge, and could have no bearing on his exercise of due care and skill.

13. *Physicians and Surgeons; Malpractice; Evidence.*—Where the action was for amputating plaintiff's leg without her consent, and for so negligently and unskillfully treating it as to make amputation necessary, evidence as to matters occurring after the amputation was incompetent, where there was no suggestion in the evidence that defendant was guilty of any negligence or lack of skill in treating plaintiff after the amputation.

14. *Same; Charts and Records.*—Charts or records kept by the nurses in a hospital for the information of the attending physician or surgeon were properly admitted in evidence in an action against such surgeon for malpractice in his treatment of such patient at such hospital, notwithstanding the fact that they doubtless signified little to the jury.

15. *Same; Sickness; Facts or Conclusions.*—A graduate and experienced nurse may properly testify that a person seemed to be or appeared to be very sick, and it would seem that any witness of ordinary intelligence might also be allowed to so testify.

16. *Same; Expert Testimony.*—It was not error to permit experts, in an action for malpractice, to answer questions as to whether there was any way known to the medical profession by which a blood clot, "in cases of this sort," could be prevented, the theory thus presented being that such testimony transcended the limits of all possible human attainment.

17. *Same; Operation; Consent.*—Where a patient was incapacitated to consent to the amputation of a leg, and the necessity therefor was extremely urgent to save her life, the surgeon treating her had a right to confer with her mother, and to act upon the consent of the mother as the implied consent of the patient; hence, where there was evidence of these facts, it was not error to admit evidence that the mother consented and stated that the patient had also consented.

18. *Same.*—Where the action was against a surgeon for malpractice in amputating the plaintiff's leg without her consent, evidence that the mother of plaintiff and the nurse told the surgeon that plaintiff was willing to have the leg amputated, was admissible as bearing upon the surgeon's good faith, although falling in the general class of hearsay evidence.

19. *Evidence; Expert; Examination; Discretion.*—It was within the power of the court, and within its discretion, to exclude questions asked expert witnesses, based on a state of facts finding no support in the evidence, although the questions are asked on cross-examination; the purpose being to keep the examination of witnesses on collateral issues within the bounds of reason and convenience.

20. *Same; Expert; Qualification.*—Where a surgeon was sued for malpractice, and testified as an expert, evidence as to his age, the extent of his practice, his place of residence, and other similar matters was admissible, since the jury was entitled to be informed of his opportunities for observation and experience in his line of

work, and to know what manner of man he was; and it was immaterial that testimony as to these matters was given by a witness other than the defendant surgeon.

21. *Trial; Objections to Evidence.*—Where the ojection did not point out a lack of proof that the works were of authority and standing with the medical profession, objections to extracts from such work were properly overruled, as the deficiency of proof might have been supplied, or the extract might have been excluded had the point been raised.

22. *Physician and Surgeon; Malpractice; Presumptions.*—Where a patient voluntarily submits to an operation by making no objection, although she knows it is about to be performed, her consent thereto will be presumed unless it is made reasonably to appear that she was the victim of a false and fraudulent representation.

23. *Same; Instruction.*—An instruction justifying the amputation without the affirmative consent of plaintiff, if an emergency demanding the operation existed which was not produced by defendant, sufficiently excluded an emergency superinduced by defendant's own negligence or lack of skill or voluntarily brought on by him, especially where plaintiff did not consider the charge of sufficient importance to call the attention of the court to the supposed deficiency.

24. *Same.*—Where it was admitted that plaintiff refused for a long time to consent to the operation, but the testimony for defendant tended to show that shortly before the operation she freely consented thereto, a charge asserting that if the patient was in imminent danger of losing her life, and was advised to have her leg amputated to save her life, it was her right and privilege to refuse, and if she did refuse, and defendant cut the leg off without her consent, it was wrongful, was not only misleading, but properly refused as ignoring evidence tending to show that she was wholly incapacitated to consent, justifying the surgeon in acting upon a consent to be implied on consideration of custom, humanity and reason.

25. *Same.*—The fact that another physician and surgeon had failed in an attempt to treat the leg, was proper for the consideration of the jury on the question of the surgeon's alleged negligence, and the alleged wrongful amputation, and hence, a charge that such fact, if it was a fact, should not be considered, was properly refused.

26. *Same; Degree of Skill and Care.*—Unless so provided by an express contract, a physician or surgeon does not warrant that he will effect a cure, or that he will restore the patient to the same condition as before the necessity for treatment arose, or that the result of the treatment will be successful.

27. *Same.*—A physician or surgeon possessing the requisite qualifications, and applying his skill and judgment with ordinary care and diligence to the diagnosis and treatment of a patient is not liable for an honest mistake, or error of judgment in making a diagnosis or prescribing a mode of treatment, where there is ground for reasonable doubt as to the practice to be pursued.

APPEAL from Birmingham City Court.

Heard before Hon. C. W. FERGUSON.

Suit by Josephine Barfield against the South Highlands Infirmary and another, for damages for alleged malpractice. Judgment for defendants, and plaintiff appeals. Affirmed.

The facts appear in the opinion of the court.

The fifth assignment of error is as follows: "The court erred in overruling plaintiff's objection to the question, 'Is it not a fact that this sort of human disaster is preventable, in your opinion and judgment as a physician?"

Assignment 7 is to overruling plaintiff's objections to the following questions: "Is it true that in case of a fracture of the femur, if a vein has been compressed by a displaced fragment of the bone, causing thrombosis, the resulting gangrene of the wound occurs?"

"Doctor, taking into consideration your knowledge of the history of this case, the kind of injury that was caused, fracture, its proximity to the blood vessel, or the probability of it impinging or resting upon a blood vessel, resting upon the fracture, and taking into consideration all that you know about the case of your own knowledge, as testified to by you, and the fact that several weeks afterward, while she was still in the infirmary under the treatment of Dr. Prince, mortification began to set in in the leg; suppose the foot became cold; no pulsation in the vessel; green spots began to appear on different parts of the limbs—what, in your opinion, was the cause of that condition?"

Assignment 8 refers to the answer to the question: "I should say she lost her limb from a gangrene or death of the limb; that would be my answer."

Assignments of error 17 to 29, inclusive, have reference, first, to declarations made by plaintiff to Dr. Jordan about the amputation, and what he said, and what she said relative thereto, and whether or not wit-

ness knew that Dr. Prince sent Dr. Jordan in to tell her about her condition.

Assignments 43 and 44 are the same, as follows: Is there any way known to the medical profession by which a blood clot in cases of this sort can be prevented?

Assignment 75 sets forth: "Miss Gossett came down and said, 'Miss Josephine says she is willing to have her leg cut off.' (Objection by plaintiff.)"

Assignment 47: "The court erred in overruling plaintiff's objection to the question, 'Did she know that her leg had been amputated?'"

The charge made the basis of assignment 101 is as follows: "If you find from the evidence in this case that plaintiff was in imminent danger of losing her life by reason of an infected or dislocated leg, and was advised by Dr. Prince to have her leg amputated to save her life, I charge you that it was her right and privilege to refuse to give her consent to the amputation, and if she did refuse to give her consent, it was wrongful."

The court gave the following charges for defendant:

"(1) If a patient voluntarily submits to an operation, her consent thereto will be presumed.

"(2) Unless it is so provided by an express contract, a physician or surgeon does not warrant that he will effect a cure, or that he will restore the patient to the same condition as before the necessity for treatment arose, or that the result of the treatment will be successful.

"(3) A physician or surgeon possessing the requisite qualifications and applying his skill and judgment with ordinary care and diligence to the diagnosis and treatment of the patient is not liable for an honest mistake or error of judgment in making a diagnosis or pre-

scribing a mode of treatment, where there is ground for reasonable doubt as to the practice to be pursued."

ALLEN & BELL, for appellant.

CABANISS & BOWIE, for appellee.

SAYRE, J.—Plaintiff (appellant) brought her action against defendants, a surgeon and an incorporated infirmary where the surgeon operated, alleging: (1) That defendants wrongfully, intentionally, and without her consent amputated one of her legs; and (2) that they so negligently and unskillfully treated one of her legs, which had been accidentally broken and injured, as to make its amputation necessary. From a verdict and judgment for defendants, plaintiff has appealed.

(1) On the undisputed evidence the defendant corporation was entitled to the general charge which it requested and received. The medical and surgical treatment and operation were prescribed and performed by the defendant Prince under an independent employment by plaintiff, and Prince, though he was a shareholder and officer of defendant corporation, in treating and operating upon plaintiff acted not at all as the agent of the said corporation nor within the line and scope of his authority as an officer. Beyond question or doubt any negligence, unskillfulness, or other wrong, if any there was, was his wrong, and for it he alone was responsible.—*Robinson v. Crotwell*, 175 Ala. 194, 57 South. 23. Such being the case, other assignments of error bearing alone upon the alleged liability of defendant corporation need not be considered.

(2, 3) On defendant's motion the deposition of Frances J. Barfield was suppressed, and this ruling is assigned for error. We do not feel sure that we are in

a position to pass upon this assignment intelligently. We have before us the deposition in narrative form, the grounds of the motion, one of which was that notice of the time and place of taking the deposition was not given to defendants, the court's ruling, and an exception reserved in due form. If any evidence was taken on the motion, we have it not before us. We are left to infer the ground upon which the court acted, though it is proper to assume that the court acted upon some one of the grounds assigned for the motion. The statute on this subject has by amendments (Acts Sp. Sess. 1909, p. 168; Acts 1911, p. 487) been reduced to a state of obscurity and confusion in some respects. Our judgment is that the last proviso to section 4032 of the Code, as amended by the act of 1911, intends that in all cases where depositions are taken on commissions from the law courts, that is, in all cases provided for by section 4030, the party against whom it is proposed to take such testimony shall, within the time allowed for the filing of cross-interrogatories, have the right to demand reasonable notice of the time and place of taking the testimony and to attend the examination when and where had, and cross-examine the witness or witnesses orally. For aught appearing the deposition was suppressed for lack of compliance with the requirement of this statute as to notice. Error must be affirmatively shown. Appellant has failed to show error in the ruling under examination.

(4) There was no error in refusing to allow plaintiff, on the examination of her witness Dr. Whelan, to have an answer to the question: "Did you know how much Dr. Prince charged for what he did for this girl?"—referring to plaintiff. Prima facie this question was inadmissible. The amount of the charge was not in issue. Defendant was morally and legally bound to ex-

ercise the same degree of care, diligence, and skill whether his charge was large or small. The fact that the charge was unreasonable—assuming that plaintiff may have been able to prove it so—afforded no inference of wrong or negligence. It may be stated further, though we are entirely satisfied with the ground of the ruling already announced, that later in the progress of the trial plaintiff had a statement of the charge that appears to have been accepted without challenge.

(5, 6) Some courts hold differently, but this court has long entertained the opinion that relevant extracts from medical treatises, recognized and approved by the medical profession as standard, may be read to the jury in evidence.—*Stoudenmeier v. Willamson,* 29 Ala. 558; *Bales v. State,* 63 Ala. 30. Appellant's real complaint at this point seems to be that defendant was allowed, on cross-examination, to ask Dr. Whelan, an expert medical witness, whether it was true, as stated in Scudder's Treatment of Fractures, a work shown to be of high authority, that "It is not very uncommon, even in closed fractures of the femur, to find gangrene of the leg developing because of laceration or pressure upon the great vessels of the limb. Early amputation of the thigh just above the fracture will be necessary in these cases. It should be done early in order to save life."

This was a statement of surgical theory and practice, made in the abstract, but strictly relevant to the concrete case sought to be shown by plaintiff. The gist of the question was whether the witness' expert opinion concurred with that of the author. Defendant was entitled to the answer.—*Stoudenmeier v. Williamson, supra.* This ruling in principle disposes of several of the assignments of error.

36—191

(7) It seems scarcely necessary to linger over appellant's fifth assignment of error. If the question was put in exactly the form shown in the bill of exceptions, it was leading. But it led away from, not to, the answer desired, and, anyhow, it was within the court's discretion ordinarily to allow a leading question. The witness was competent, the expert opinion called for was relevant, and there was no error.

(8) Assignments 7 and 8 cannot be sustained. Some of the facts hypothesized in these questions, seeking to elicit an expert opinion, had not been proved. It would have been better practice to defer the questions until evidence of all the hypothesized facts had been offered, as it was at a later stage of the case; but errors of this sort cannot be allowed to work a reversal where, as here, they have been substantially cured.

(9) Plaintiff testified that her limb had been removed without her knowledge or consent, over her protest indeed. She seems to intend to convey the idea, though it is hinted rather than asserted, that from the time she went to the infirmary where defendant Prince operated and was put in his charge she was kept in ignorance of the danger of her condition and deceived as to the measures that would be resorted to for her cure. To answer this, probably, defendant was permitted to show by the nurse that on the morning of plaintiff's removal to the infirmary defendant had said to plaintiff's mother, who was making the arrangement for plaintiff, that 'he would not guarantee her, but he would do all he could for Miss Josephine," the plaintiff. If this testimony tended to prove anything at all, it was, in view of the intimations of plaintiff's evidence to which we have referred, probably competent for the purpose for which it was admitted in the trial court, viz., to rebut the contention that defendant made any agree-

ment or promise that he would restore the plaintiff to health or save her leg. Otherwise, taken at its worst, it was nothing more than a commonplace of so little significance that it would be a travesty to set aside the result of the trial in this case on this ground.

(10) Defendant, testifying in his own behalf, after consulting the fever charts that had been kept by the nurses, was allowed to state what those charts showed at various places in respect of the patient's temperature. It was, however, made perfectly clear—this witness made it clear—that he was not testifying to the historical accuracy of the figures, or, for that matter, testifying at all; he was merely reading the undisputed record prepared by the nurses and already before the jury. This was not the violation of any rule of evidence; it was merely a matter of practice which in the case of an ordinary witness would be pronounced bad, and, if it appeared probable that it led to results of any account, might induce a reversal. But the witness was not an ordinary witness; he was an expert, entitled to state his opinions on the technical questions involved, was in effect giving his opinion on the whole course of treatment administered to plaintiff, and his reference to the temperature charts here in question—the authenticity and historical accuracy of which, we may add, was fully established and undisputed—read in connection with the rest of his examination, appear to have amounted to nothing more than statements of some of the considerations that influenced his professional judgment from time to time in respect of the proper treatment to be followed. We find no grounds for reversal in this.

(11) Plaintiff had testified that she was ignorant of the amputation of her leg for several days after it had

been done, this in support of her claim that the operation had been performed without her knowledge or the consent she at one time refused to give. Defendant was allowed to ask the nurse in charge whether plaintiff knew her leg had been amputated. If, according to the narrow rule that has been sometimes here enforced, the question asking for the witness' cognition of the state or operation of plaintiff's mind was improper, its consequence as error was relieved by the answer which stated only cognizable facts. The witness answered: The patient would lay there and watch her limb being dressed every time it was dressed.

(12, 13) Appellant's assignments of error numbered 17 to 29, both inclusive, are treated together under one head in the briefs. It seems enough to say that statements made or things done in the absence of defendant should not have been allowed to affect a finding as to his exercise of due care and skill unless brought to his knowledge. Another reason, applicable to several of the matters plaintiff here sought to get before the jury, and conducing to the same result, is that they are shown by the proposed questions to have occurred after the amputation, and we are unable to find in the declaration or evidence any intimation that defendant was guilty of any negligence or lack of skill in treating plaintiff after the amputation. As for plaintiff's declaration, before the operation, that she would rather die than have her leg cut off, it may be said, further, that there was no denial, but that plaintiff long persisted in her refusal to have the operation performed. Defendant himself testified to that. The only question at issue in this connection was whether within an hour or two before amputation plaintiff did consent after being informed that she would forfeit her life by a refusal.

Some of these exceptions may be answered on other legal grounds. We find no reversible error here.

(14) The charts or records kept by the nurses were kept for the information of the attending physician or surgeon. Everything in them was proper for his information. They were duly proved. Defendant had a right to consider them in determining his treatment, and the jury were properly allowed to have these charts before them as part of the evidence in the case, though doubtless they signified little to any but the skilled professional mind.

(15) We think any witness of ordinary intelligence may be allowed to testify that a person appeared to be very sick; certainly a graduate and experienced nurse, as Miss Gossett was, may so testify.

(16) For the reason that much space and a wealth of illustration, drawn from sacred and profane sources other than law books, have been devoted to a discussion of the forty-third and forty-fourth assignments of error, we linger over these assignments long enough to say that we are unwilling to conclude, as matter of law or fact, that Dr. Moore, shown to be an expert, transcended the limits of all possible human attainment when he testified that there was no way known to medical science to prevent thrombosis in a case of the sort. It is safe to say the doctor knew more of that subject than we do. He was entitled to give his opinion, and the objection went only to its credibility.

(17) Conversation between defendant and plaintiff's mother in which the latter is said to have stated that her daughter had consented, and that it was all right to go ahead and cut off her limb, this immediately after she had been told that her daughter had consented and had consulted with her daughter for the purpose, as the jury were well authorized to infer, of confirming that

report as to her daughter's state of mind. If the mother's deposition had not been excluded, this evidence would have been admissible for impeachment. It was competent anyhow. It scarcely need be debated that plaintiff, if capable of intelligent consideration of the question involved, had the absolute moral and legal right to determine the issue for herself, as defendant contends on the strength of his evidence she in fact did, and an operation of this capital character, performed without regard to her wishes in such case, could not be justified in any forum of law or conscience. But considering plaintiff's contention as to her condition at the time of her alleged consent, the evidence as to which on the part of plaintiff she seems to overlook in her argument for a reversal on this point, considering the incapacity she claims to have labored under at the time, and the extreme urgency of the case as shown by the expert evidence, if believed, it was proper for defendant to consult with the mother—and not conceivably improper in any event—and to act upon her consent as the implied consent of plaintiff.—*Mohr v. Williams,* 95 Minn. 261, 104 N. W. 12, 1 L. R. A. (N. S.) 439, 111 Am. St. Rep. 462, 5 Ann. Cas. 303; *Baker v. Welsh,* 144 Mich. 632, 108 N. W. 94, 7 L. R. A. (N. S.) 612, 8 Ann. Cas. 195; *Luka v. Lowrie,* 171 Mich. 122, 136 N. W. 1106, 41 L. R. A. (N. S.) 290.

(18) There is an even more obviously sufficient response to the exception last above noted and to the seventy-fifth assignment of error in which appellant complains that the court admitted the testimony of defendant that "Miss Gossett came down and said 'Miss Josephine says she is willing to have her leg cut off.' " Under the circumstances which have appeared, no negligence could be charged to defendant in accepting this statement and that of plaintiff's mother as expressing

the true state of plaintiff's mind; at least these state-
ments, though falling in the general class of hearsay,
went a part of the way towards demonstrating defend-
ant's good faith in performing the operation which
plaintiff charged, inter alia, was performed without her
knowledge or consent.

If it be conceded that there was technical error in
allowing the question made the subject of the forty-
seventh assignment of error, its capacity for harm to
plaintiff's case was cured by the witness' statement of
the facts on which he based his knowledge of plaintiff's
cognition, so that the jury were fully informed of the
worth of the testimony, and must be presumed to have
given it proper weight.

(19) We have not had our attention called to any
authorities sustaining appellant's contention that it
was error, even on cross-examination, to deny parties
the privilege of asking for an expert opinion on a state
of facts finding no support in the evidence. Such ques-
tions may, at times, serve a proper purpose, but our
opinion is that there is no reversible error in refusing
such a test of an expert opinion, for the process involved
must, of necessity, depend upon the court's power and
discretion to keep the examination of witnesses on col-
lateral issues within the bounds of reason and conven-
ience. This, we think, will answer several of the assign-
ments of error.

(20) Defendant was also a witness, qualified as an
expert on the questions involved. The jury were enti-
tled, in a general way, to be informed of his opportun-
ities for observation and experience in his line, and in
general to know what manner of man he was. Within
this rule, without perjudice to plaintiff's case, and with-
out conveying any intimation that such conditions af-
fected the rule of due care, the jury might be given to

understand whether defendant was young or old, did a large practice or none at all, resided in Birmingham or Toad Vine, and other like things, and we do not see that it makes any difference in principles that inquiries to this end were directed to another witness rather than to the defendant himself. It is common practice to introduce a witness with inquiries of this character, though they be of slight or no importance as decisive factors in the case.

(21) As to some of the objections taken to scientific medical works, extracts from which were introduced in evidence by defendant, notably Transactions of the Medical Association of Alabama, it appears that there was no proof that they were works of authority and standing with the medical profession. The objections were of the utmost generality and did not point to this deficiency. No doubt the deficiency would have been supplied, or the extracts excluded, had the objections taken the point.

(22) Defendant could not, of course, compel plaintiff to submit to an operation; but if she voluntarily submitted to the operation, that is, knew it was about to be performed and made no objection, her consent was to be presumed, unless she was the victim of a false and fraudulent representation; this last a fact to be made reasonably clear in the evidence. The trial court in effect so charged the jury, and in this there was no error. —*State v. Housekeeper,* 70 Md. 162, 16 Atl. 382, 2 L. R. A. 587, 14 Am. St. Rep. 340;

(23) It is urged that in one part of the oral charge the court allowed the jury to justify defendant's amputation of plaintiff's limb without her consent, if she did not affirmatively consent, on the ground that there may have existed an emergency demanding the operation, although such emergency may have been superinduced by

his own negligence or lack of skill, or may have been voluntarily brought on by him. The charge, its parts relating to this question construed together, is not fairly open to this criticism. When the court finally came to a statement of the effect of the emergency doctrine on the conclusion to be reached, it postulated an emergency "not produced by the defendant." This might have been amplified into verbiage meeting specifically the criticism visited upon the charge in appellant's brief, but unless appellant considered the matter of importance enough to call the court's attention directly to the supposed deficiency, the court's general statement must be held to have sufficed.

(24, 25) The charge made the subject of assignment 101 was refused without error. It was misleading. It did not adequately state the case. Plaintiff did refuse for a long time to submit to the loss of her limb. The charge was so framed as that the jury may have been led to believe that this fact was conclusive against defendant's right to amputate. But defendant's testimony was that at the last moment she did freely consent, and the situation at that time determined defendant's right and duty in the premises. A fair statement of the applicable law would have taken some account of this consideration. Besides, this and other instructions refused to plaintiff postulated defendant's liability upon the hypothesis that plaintiff did not consent. The argument for error in the matter of these rulings overlooks plaintiff's contention that she was wholly incapacitated to consent. If that were the case, defendant may have been justified in acting upon a consent, not actually given, but to be implied on considerations of custom, humanity, and reason, as the authorities to which we have heretofore referred and many others amply demonstrate. These charges were properly refused because they omit-

ted any statement of the law of this aspect of the case.

(26) There was no error in the court's refusal to instruct the jury that in determining defendant's liability they should not consider the fact, if it was a fact, that another surgeon or physician had made a failure in an attempt to treat plaintiff's leg, and had made it probable that plaintiff would lose her life if the leg was not amputated. The charge was manifestly wrong. It occurs to us that the facts hypothesized were necessary to be considered in passing upon the question of defendant's alleged negligence in the treatment of the case and his alleged wrong in amputating the leg. Plaintiff had been under treatment for her injury for two months before she came under defendant's care. She had been in the care of an expert physician and surgeon as plaintiff was at pains to prove. And yet there was in the evidence room for the inference that the medical man first called was discharged, and defendant retained, because no relief had been afforded. These facts and the probability hypothesized in defendant's statement of the case it was necessary to consider in determining whether the result of which plaintiff complained may not have been brought about by a course of treatment over which defendant had no control and the effects of which no skill or care on his part could have obviated. Of course, we speak not of our view of the facts, but only of the case made by tendencies of the evidence and the concessions of plaintiff's requested charge.

Several charges refused to defendant proceed upon the idea that the amputation was wrongful, and that therefore plaintiff was entitled to damages, if it was done without her consent, and seem to pretermit the emergency theory of consent. These charges, in view of tendencies of the evidence, should have given a definition of consent as containing the consent, in a proper

[Barfield v. South Highlands Infirmary, et al.]

case of emergency, of plaintiff's family, her mother, for example, in this case, and without this they had a misleading tendency. Some of them were misleading also as apparently basing plaintiff's right to recover on her dissent expressed before the emergency arose, or before the assent she finally gave when confronted with the alternative of amputation or death.

(27, 28) Charges given on defendant's request, defining the degree of care required of physicians and surgeons in the treatment of their patients, were evidently based upon our cases. They state the law of our cases as it may be read in *McDonald v. Harris,* 131 Ala. 359, 31 South. 548; *Shelton v. Hacelip,* 167 Ala. 217, 51 South.. 937; *Hamrick v. Shipp,* 169 Ala. 171, 52 South. 932; *Carpenter v. Walker,* 170 Ala. 659, 54 South. 60, Ann. Cas. 1912D, 863; *Robinson v. Crotwell,* 175 Ala. 194, 57 South. 23.

We believe proper and careful attention has been given to all of the 118 assignments of errors found in the record, though not all of them have been made the subject of specific statement. Thus working our way through the record from first to last, making occasionally, perhaps, statements of our consideration reaching beyond the limits of necessity or profit, we have found no error for which we can think the judgment in this case should be reversed.

Affirmed.

ANDERSON, C. J., and MCCLELLAN and GARDNER, JJ., concur.