13 So.2d 48

**INGRAM v. HARRIS.**

**6 Div. 69.**

Supreme Court of Alabama.

April 15, 1943.

London & Yancey, Geo. W. Yancey, and Fred G. Koenig, Sr., all of Birmingham, for appellee.

Beddow, Ray & Jones, of Birmingham, for appellant.

248

LIVINGSTON, Justice.

This is a civil action by Mrs. Leta V. Ingram, as administratrix of the estate of Thomas C. Ingram, deceased, against H. A. Harris, a physician and surgeon, for malpractice, alleged to have caused the death of said Thomas C. Ingram.

The action may be sustained on proof of a failure to exercise reasonable and ordinary care, diligence and skill in respect to the duty so assumed and undertaken as physician and surgeon such care and skill as physicians and surgeons in the same general neighborhood, pursuing the same general line of practice, ordinarily employ and exercise in a like case. Moore v. Smith, 215 Ala. 392, 111 So. 918, and authorities there cited; Carraway v. Graham, 218 Ala. 453, 118 So. 807.

Unless by express undertaking a physician or surgeon does not warrant a cure or a successful result, and is not liable for an honest mistake or error of judgment in making a diagnosis, or prescribing a mode of treatment, where the proper course is subject to reasonable doubt. Barfield v. South Highlands Infirmary, 191 Ala. 553, 68 So. 30, Ann.Cas.1916C, 1097; Moore v. Smith, supra; 21 R.C.L. 381, section 27.

The doctrine of res ipsa loquitur does not apply in such cases, and the burden of proof is on the plaintiff to show negligence in the diagnosis or treatment, and it is not enough to show that an unfortunate result followed such diagnosis or treatment. Moore v. Smith, supra; Carraway v. Graham, supra.

Keeping in mind the foregoing rules of liability—rules well established and recognized in this and other jurisdictions—we proceed to a consideration of the propriety of the trial court's action in giving to the jury, at the written request of the defendant, the general charge, without hypothesis.

Thomas C. Ingram died at the South Highlands Infirmary in Birmingham, Alabama, between six and seven o'clock in the evening, Monday, June 17, 1940. He was forty-seven years of age, and for sixteen years or more had been connected with and worked for the Birmingham Fire Department; and at the time of his death ranked as lieutenant. He was described by witnesses as a big, strong, well developed man about six feet tall and weighing one hundred and eighty to one hundred and ninety pounds. On Tuesday, June 11, 1940, while drilling other city firemen, that is to say instructing them, in setting up and climbing ladders, laying lines, setting up pumps, etc., Mr. Ingram received an abrasion or contusion on his left forearm, about the middle of the arm, and over an old scar, extending practically from the elbow to the wrist. On June 13, 1940, Mr. Ingram went to the defendant, Dr. Harris, for treatment of his arm. Dr. Harris testified: "I am classified as the city surgeon, and it is my duties [duty] to treat policemen and firemen injured while on duty. The city of Birmingham pays me for it. * * * I treated the place with antiseptic solution, and gave him a prescription for Prontylin, which is a sulphanilamide preparation, five grain tablets, two tablets every four hours; and prescribed to use hot Epsom salt solution. The name of this preparation here, Prontylin, is a trade name for sulfanilamide, put out by the Winthrop Chemical Company, five grain tablets, accepted by the American Medical Association as an authentic preparation. Sulfanilamide or this Prontylin is given to combat infection. It is given for treatment, a prophylactic treatment. By that I mean as a preventive measure when an infection of any type exists or is liable to exist. He did come back the next day. I treated his arm again

and told him to come back the next day, and to keep up the Epsom salt application. When he came back the next day, that was Saturday, his arm was healing up, and he was anxious to go back to work, and I told him he could go back to work the next time that his shift came on, which was Monday. He said he had pains in his arm, yes, sir. It is my opinion, it was safe for him to go back to work Monday. He told me that he had had trouble with his blood pressure, and asked me if I would be good enough to check that for him. I took his blood pressure, and it was 185 systolic, and the diastolic was a hundred. Yes, sir, that was high. * * * At the time Monday afternoon, when I received word that he had been taken, I was tied up at the West End Baptist Hospital on an obstetric case. I was then engaged on an obstetrical case at the West End Baptist Hospital; didn't leave there for several hours. * * * Yes, sir, I knew that Dr. Green was in charge. I talked to my office, and my nurse contacted Dr. Green, and Dr. Green took charge of the case, as my assistant, and sent him to the hospital, made the arrangements, and went over there and stayed with him until he died."

On cross-examination, Dr. Harris testified: "Now, Thursday, the 13th, I saw him. That was in my office. At that time there was nobody with him. On his physical anatomy I observed an abrasion, a contusion of the left arm, about the middle of the arm. I tell the jury a cut would be clear through the skin, but this didn't go right through the skin. It went through the superficial skin but not down through all the layers of the skin. That we classify as an abrasion. * * * I would not say he had as much as a cut; he had an abrasion. * * * A contusion is a bruise. An abrasion is a breaking of the skin. * * * I didn't examine his heart at any time. On the 13th, that is the first day I saw him I just used an antiseptic solution on it. * * * I have forgotten whether I put a dressing on there or not. I know I treated it. * * * As compared with the 13th, it was doing very satisfactorily on the 14th. * * * I saw him 13th, 14th and 15th. On those three days his arm was improving and his condition was satisfactory. He did not complain on the 15th that I remember. * * * On that day he asked me to let him go back to work. I asked him when his shift come back, and he said, 'Monday,'; and I told him he

could go back to work Monday. On Thursday, the 13th, he complained of pain, that is all. On either of the three days, the arm was the only complaint. I did not see him on the 16th. I did not see him on the 17th, if that is the day he died. * * * At forty-seven years of age, the proper figures for him should run around 140 over 80 (meaning blood pressure). * * * I am city physician paid by the city. * * * All I am required to do is to look after them when they are hurt while on duty. * * * I wasn't asked to go out to Tom Ingram's house. * * * This on here is the statement he made to me. 'While drilling, in pulling out hose from wagon, brass coupling scratched and bruised my left arm.'"

Dr. Henry Green testified: "I remember on the 17th day of June 1940, Mr. Thomas Claud Ingram coming to my place —a fireman. He was brought to my office in an ambulance. Yes, sir, he stayed in my office some time: he stayed there anywhere thirty minutes to an hour. * * * I treated him there, yes sir. Then they took him to the hospital. I did not go to the hospital with him. He went in an ambulance. But I went immediately to the hospital. He came into the office, and he was cold and clammy, and complaining of extreme pain in his left chest and left shoulder. He was covered with cold perspiration and was cyanotic and shock. When we got to the hospital he was given the usual treatment for shock, which is to relieve pain. He was given morphine and nitroglycerin. He was given atropine hypodermically. Also the foot of the bed was raised, hot water bottles applied, and an oxygen tent was put over him. * * * No, sir, he did not have any fever. And his temperature was practically normal. His blood pressure was low. I forget the exact reading, but I recall it was low. * * * I was there with him and worked on him until he died. I did make out a certificate for his death. * * * That shows 'coronary occlusion.' A coronary occlusion is the stoppage of blood clot that occurs in the coronary arteries, which are the arteries that supply the heart; and any stoppage of that blood vessel is called coronary occlusion. The blood clots are the things that stop a blood vessel that way. * * * We doctors don't know what causes blood clots. I say that in my opinion, from experience, he had the coronary occlusion. * * * It may occur

in most any age. It usually occurs in people after the age of 40. They may never have had any symptoms before, or they may have had symptoms of cardiac embarrassment before it. They usually complain of pain in the left chest, or left precardial region, left shoulder or left arm. If the coronary occlusion is a large one, that causes death, the patient becomes shocked, the pulse becomes weak, and they become cyanotic and usually have a fall in blood pressure, and the patient goes on and either dies or the blood clot, something happens to it that he becomes relieved and the patient will gradually improve. It may occur to a man perfectly healthy, apparently perfectly normal and strong, appearing just like we do here, that type of individual or anything else. We see lots of cases without any symptoms at all, like out at the football game or a baseball game, they have this heart attack, or a man will be sitting at the dinner table and it occurs. That is right, just knock him out. They may die immediately or it may be a few hours, or they can live a good while and live to overcome that and never have any more, or it might recur any time. I did not find any symptoms of blood poisoning or erysipelas. Now, blood poison might affect you differently from erysipelas. You ask if you should have fever with those, and my answer is, we have fever with infection; yes, sir; and those both are infectious diseases. I did not find any evidence of infection. Treating a wound, a scratch on the arm where the scratch is in a large scar, I would say that it was more likely to be infected where there has been a previous injury in scar tissue there. * * * I would say that soaking in hot Epsom salts solution was part of the correct treatment. I would not say it was complete. * * * Under circumstances of that kind, I would say some form of the sulfa drugs is accepted treatment, along with your hot Epsom salts, or plain tablesalt, and rest, I would say would be the accepted treatment. Yes, sir, and rest. * * * I would say that I saw no evidence of infection at the time of his death."

Lay witnesses, including Ingram's wife and sister, testified that Ingram's arm was red and swollen, that red streaks radiated up and down his arm from the abrasion or contusion: that he complained of pain in his arm and shoulder.

We do not attempt to set out all of the evidence, but all of it has been carefully read and considered in conference.

If, as testified by Dr. Green, Mr. Ingram came to his death by reason of a coronary occlusion, that affliction is connected with the injury to his arm by the barest surmise, speculation or conjecture. But assuming its connection, an assumption which we think entirely unwarranted under the evidence, there still is a total lack of evidence that Dr. Harris negligently diagnosed the case or negligently prescribed its treatment.

█ This Court in the recent case of Harbin v. Moore, 234 Ala. 266, 175 So. 264, 265, said:

"It is of course well recognized that in no case is negligence assumed from the mere fact of an injury, and that the scintilla doctrine prevailing in this state does not conflict with the well-known rule that a conclusion as to liability that rests upon speculation or mere conjecture is not the proper basis for a verdict.

"As to this latter rule, in the recent case of Georgia Power Co. v. Edmunds, 233 Ala. 273, 171 So. 256, 258, approvingly quoted from Southern R. Co. v. Dickson, 211 Ala. 481, 100 So. 665, is the following language here pertinent:

" ' "Proof which goes no further than to show an injury could have occurred in an alleged way does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause."

" 'But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.'

"Many of our cases have in varying language expressed the same thought. South-

ern R. Co. v. Miller, 226 Ala. 366, 147 So. 149; Mobile & Ohio R. Co. v. Hedgecoth, 215 Ala. 291, 110 So. 44; Alabama Power Co. v. Bryant, 226 Ala. 251, 146 So. 602; City of Tuscaloosa v. Fair, 232 Ala. 129, 167 So. 276; Carraway v. Smith, 218 Ala. 412, 118 So. 758; Bromley v. Birmingham Mineral R. Co., 95 Ala. 397, 11 So. 341; Cooper v. Agee, 222 Ala. 334, 132 So. 173; Brown Funeral Homes & Ins. Co. v. Baugh, 226 Ala. 661, 148 So. 154; Koger v. Roden Coal Co., 197 Ala. 473, 73 So. 33.

"Each case turns upon its own peculiar facts, and other cases are helpful only by way of analogy."

Under the evidence in the instant case, the conclusion that Dr. Harris negligently diagnosed or negligently treated the illness of Mr. Ingram could rest only upon pure speculation or mere conjecture, and there was no prejudicial error in giving the general charge, without hypothesis, for defendant.

Affirmed.

GARDNER, C. J., and THOMAS and BROWN, JJ., concur.