Mrs. Lucille **ROBERTS**, Plaintiff,

v.

**Arthur A. WOOD, M.D.,** **Defendant.**
Civ. A. No. 2449.

United States District Court
S. D. Alabama, S. D.
July 27, 1962.

George M. Simmerman, W. L. Richardson, Pascagoula, Miss., Albert Sidney Johnston, Jr., Biloxi, Miss., Paul W. Brunson, Mobile, Ala., for plaintiff.

Inge, Twitty & Duffy, Mobile, Ala., for defendant.

DANIEL HOLCOMBE THOMAS, District Judge.

Jurisdiction exists by virtue of diversity of citizenship in that plaintiff is a citizen of the state of Mississippi and defendant is a citizen of the state of Alabama and the amount sued on exceeds the sum of $10,000 exclusive of interest and costs.

Mrs. Roberts first visited Dr. Wood in 1953 at the suggestion of her family doctor in Mississippi. It was then determined that plaintiff had a diffuse toxic goiter and that an operation to remove a portion of her thyroid gland was necessary. As plaintiff was pregnant, this operation was not performed until sometime during the following year and after the birth of her child. The post-operative effect of the operation, in which 95% of the gland was removed, was a smooth, uneventful recovery and is not at issue here other than as background information relative to a second operation in 1959 which constitutes the subject matter of this suit.

Between 1954 and 1959 evidence of toxic goiter, extreme nervousness and anxiety, together with the recurrence of a nodule in the neck, prompted plaintiff to seek further medical attention. She consulted with her family physician who recommended that she see a local specialist. Plaintiff and her husband decided, however, to return to Dr. Wood inasmuch as he had performed the first operation and would be more familiar with her condition and medical history. The defendant determined a second operation was required and prescribed pre-operative medication to prepare the patient for this. As it will be necessary to discuss in some detail the mechanics of the operation later in this opinion, that matter will not now be set out. Suffice it to say that the operation was

performed in June of 1959 without any apparent complications; on the contrary, the operation appeared to be physiologically successful in all respects. Immediate post-operative examination revealed that the patient had full use of both vocal chords and had not suffered any incidental injury in the area where the surgery was accomplished.

Sometime thereafter the plaintiff experienced a hoarseness in her voice which interfered with her normal speech. This condition developed to the point where the plaintiff lost the use of her true vocal chords and unconsciously substituted the use of her false vocal chords. At the trial she spoke in what is best described as a loud stage whisper. It was the opinion of one of defendant's experts, a laryngologist, that the plaintiff is malingering, that the use of the false vocal chords is a deliberate and conscious effort on her part. Plaintiff's expert testified that in his opinion, if one has the use of his true vocal chords, he cannot use his false vocal chords. Neither of these views reflects those of the majority of the experts or of the Court. To begin with, this lady has been suffering from the condition for nearly three years, and she is obviously distressed and very much concerned over her lack of ability to phonate properly. In addition, the demonstration of the use of the false vocal chords by one of the doctors negates the testimony in that regard of plaintiff's expert. The Court also expresses its opinion that the institution of this suit was not, as suggested by counsel for defendant, inspired by any reasons of malice or revenge on behalf of plaintiff or her husband. If the considerable amount of medical attention, with its attendant high costs, this family has been required to seek in the last few years has made them perhaps more anxious than some for satisfactory results and an end to the expense, it should not be taken to infer an opprobrious motive in bringing this suit. Although plaintiff's condition is subject to improvement, as will be noted later, it nevertheless exists now and is a very serious handicap to her.

It is difficult to determine when this condition was brought to the attention of Dr. Wood. According to the plaintiff's testimony, she told him of the trouble before being discharged from the hospital and again on numerous visits to his office and up to the time of her last visit to him on November 11, 1959. Mrs. Roberts stopped seeing the doctor then, although he told her to return in two weeks; but she continued visits to various doctors in and around Pascagoula, Mississippi. The defendant testified that while he was aware of a hoarseness which he thought would gradually improve, the first notice he had of any voice change was in a letter to him from the plaintiff's husband dated August 16, 1959. He further stated that on all visits subsequent to the operation the patient seemed to be using her true vocal chords.

Regardless of when this condition (the use of the false vocal chords) did develop, the proof is ample to support the conclusion that it was not while the patient was hospitalized. But the important question for purposes of determining the defendant's liability is not when the condition developed, but rather why.

Dr. Claude Warren, a court-appointed ear, nose, and throat specialist, upon examining the plaintiff, determined that she is suffering from paralysis of abduction of the right vocal chord, which is due to failure of the recurrent laryngeal nerve to function properly. He further found that the right chord is affixed near the mid-line and that the left chord is unimpaired and capable of normal movement. Plaintiff contends that this condition is due to the negligent manner in which the operation was performed, resulting in injury to the recurrent laryngeal nerve.

The defendant does not deny that the nerve fails to function and that the failure may be due to the operation. He asserts, however, that risk of injury to this nerve is a normal and inherent hazard in the performance of all thyroidectomies; that the hazard is increased with a second operation, particularly when, as here, the nodule to be removed

is adhered to the nerve; and that paralysis of abduction of one vocal chord does not preclude the use of normal voice.

In passing on the issue of negligence, insofar as regards the operation itself, the Court is presented with two questions: Did the defendant select the correct surgical technique; and, did the defendant fail to perform the operation by the technique selected by him in accordance with that degree of care and skill which the law imposes upon him? An answer to these questions requires a consideration of the testimony of the various expert witnesses who appeared at the trial. That which now follows summarizes the most pertinent portions of that testimony.

The use of the vocal chords is controlled by impulses sent from the brain through the nervous system to the muscles attached to the vocal chords. There are two sets of nerves which serve as conduits of the impulse in this relay, the superior laryngeal nerves and the recurrent laryngeal nerves, with one of each affecting the use of each vocal chord. The superior laryngeal nerves control the motion of adduction, that is, the movement of the vocal chords towards each other. The recurrent laryngeal nerves control the motion of abduction, that is, the movement of the vocal chords away from each other. The recurrent laryngeal nerve which controls the movement of the right vocal chord now fails to function.

It is universal knowledge among surgeons that risk of injury to the recurrent laryngeal nerves presents one of several inherent hazards in performing a thyroidectomy. This is due primarily to the intimate relationship of these nerves to the thyroid gland because of variations in individuals of the course of those nerves around or, in some cases, through the thyroid gland. The hazard is increased because of the great sensitivity of these nerves to injury which may be produced by complete or partial severance, stretching, trauma, edema, or scar tissue. One of the main problems in a thyroidectomy is, therefore, to perform the operation so as to avoid injury to these nerves. Surgeons are divided on two alternative techniques to accomplish this. Both techniques are acceptable, both are used in the Mobile area, and in some cases both are used by the same doctor in different instances.

The first technique is the so-called standard technique. In this operation the surgeon removes the greater portion of the thyroid gland leaving a residue in the area where the nerves would normally be located. He makes no attempt to expose or otherwise isolate the recurrent laryngeal nerves but relies on his knowledge of the area around the gland and by avoiding dissection of that area adjacent to the nerve attempts to protect it from injury.

The second technique is the Lahey method, a more modern procedure whereby the nerves are visualized, identified and put to one side. This is accomplished by turning the whole gland up and exposing the recurrent laryngeal nerve throughout its course as it passes behind the gland in intimate relationship with it at this point of entrance into the larynx. The gland may then be either partially or wholly removed.

While both of these techniques are correct, neither one entirely eliminates the possibility of damage to the nerve. The possibility exists in the standard technique because the nerve may not be in its normal location. It exists in the Lahey technique because the mere handling of the nerve produces trauma which may be sufficient to cause permanent damage. Moreover, regardless of which technique is used, there is an irreducible minimum percentage of cases in which this inherent hazard will materialize and in which the nerve will be injured, even in the most skilled hands.

The first operation performed on Mrs. Roberts by Dr. Wood was done according to the standard technique. As stated previously, this operation was successful in all respects. The operation performed in 1959 was done according to the Lahey technique. The reasons this

technique was selected were that the nodule was adhered by dense scar tissue to the recurrent laryngeal nerve which controls the movement of the right vocal chord, and the doctor thought it necessary to remove the entire gland in order to prevent another recurrence of the nodule. The evidence establishes that this decision by the defendant was entirely correct and proper, necessary not only for the patient's future well-being but also to minimize risk of injury during the operation. It follows that liability does not lie on the ground that the defendant chose the wrong operative procedure.

With regard to the alleged failure of the defendant to exercise the requisite degree of skill and care in performing the operation, plaintiff relies on simple negligence and the doctrine of res ipsa loquitur.

First, plaintiff says she was not sufficiently advised as to the seriousness of the operation. In undertaking to perform the operation, Dr. Wood did not, absent express contractual agreement, thereby become a guarantor of a successful result. Snow v. Allen, 227 Ala. 615, 151 So. 468. There is no evidence that he misrepresented the serious nature of the operation or failed to inform the patient of its attendant dangers. I do not mean to suggest that defendant should have told plaintiff of all the hazards involved, including risk of injury to the recurrent laryngeal nerve. Doctors frequently tailor the extent of their pre-operative warnings to the particular patient, and with this I can find no fault. Not only is much of the risk of a technical nature beyond the patient's understanding, but the anxiety, apprehension, and fear generated by a full disclosure thereof may have a very detrimental effect on some patients. In this case the defendant told the patient, among other things, that the operation would be similar to the one she had undergone in 1954. In view of the patient's emotional state and her concern over this operation as well as a gynecological operation to be performed at the same time, in addition to having previously experienced a thyroidectomy, I am of the opinion the patient was properly advised of the seriousness of the operation.

Second, plaintiff alleges that improper administration of anesthesia at the time of operating, and failure of defendant to remain advised as to the condition of the recurrent laryngeal nerve during the operation constitute negligence. There being a total lack of proof as to the existence or effect of these matters, it is unnecessary to consider them further.

The only evidence which remotely suggests negligence on the part of the defendant is the fact that plaintiff's right vocal chord is paralyzed, and the fact that she does not use her normal speaking voice. But these facts alone are not sufficient to prove negligence during the operation. Plaintiff's doctors would not say what caused the paralysis, although they did recognize the same possible causes of injury heretofore mentioned. It was the consensus among defendant's experts that the probable cause of the paralysis is that the nerve is bound up in scar tissue and has lost its power to transmit the nerve impulse. The defendant believes that it is perhaps due to trauma normally incidental to the surgery. This uncertainty among the doctors as to the cause of the nerve's disfunction points out the difficulty of plaintiff's proving her case as to negligence. In Ingram v. Harris, 244 Ala. 246, 13 So.2d 48, citing other cases, are found these quoted remarks from Harbin v. Moore, 234 Ala. 266, 175 So. 264:

"It is of course well recognized that in no case is negligence assumed from the mere fact of an injury, and that the scintilla doctrine prevailing in this state does not conflict with the well-known rule that a conclusion as to liability that rests upon speculation or mere conjecture is not the proper basis for a verdict.

\*    \*    \*    \*    \*    \*

" 'Proof which goes no further than to show an injury could have occurred in an alleged way does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.' "

The determination as to the existence of negligence is one of fact, which in this case must be resolved in favor of the defendant. Although all but one of the doctors recognize plaintiff's condition is attributable to the operation, none has attempted to indict the defendant for the manner in which he performed it. Considering that this was the second operation in the same area, that the nodule was affixed to the recurrent laryngeal nerve, that the operation in and of itself is trauma, that there now is dense scar tissue unavoidably present around the nerve, and that both vocal chords were functioning after completion of the operation, the Court must conclude that plaintiff has simply failed to prove wherein the doctor is guilty of negligence. The proof of negligence lacking, I am of the opinion that the operation was performed according to the standards of skill and care exercised by surgeons generally in performing thyroidectomies in the Mobile area. Snow v. Allen, supra.

■ With respect to the applicability of the doctrine of res ipsa loquitur in malpractice suits under Alabama law as invoked in the amended complaint, plaintiff has directed the attention of the Court to the case of Sellers v. Noah, 209 Ala. 103, 95 So. 167. In that case, plaintiff sued *ex contractu* for failure of the surgeon to remove a needle from plaintiff's body when closing the wound after an appendectomy. The Supreme Court of Alabama in passing on the correctness of certain jury charges said that the presence of the foreign matter in the body passed to the surgeon the burden of showing he exercised the requisite care and skill. A close reading of subsequent opinions of the Alabama Supreme Court negates the inference plaintiff would have this Court draw on the basis of the Sellers case. In Moore v. Smith, 215 Ala. 592, 111 So. 918, the Court stated:

"The doctrine of res ipsa loquitur does not apply to the mere fact of a blood infection, however closely, in temporal sequence, it may follow a medical treatment. 'The burden of proof is not shifted by showing that an unsuccessful result has attended the treatment of the patient by the physician. Nor does the unsuccessful result of the case shift from the plaintiff to the defendant the burden of going forward.' "

This case and the many which have followed it, affirmatively reject the doctrine of res ipsa loquitur in suits charging physicians and surgeons with malpractice. See McKinnon v. Polk, 219 Ala. 167, 121 So. 539; Stephens v. Williams, 226 Ala. 534, 147 So. 608; Snow v. Allen, supra; McTyeire v. McGaughy, 222 Ala. 100, 130 So. 784; Ingram v. Harris, supra; and, Watterson v. Conwell, 258 Ala. 180, 61 So.2d 690. This is true not only in Alabama but in other states as well. For a case of striking similarity to the case at bar see Di Filippo v. Preston, Del., 173 A.2d 333.

Plaintiff also seeks in the complaint to charge defendant with abandonment of the case in that he is guilty of an unwarranted lack of diligence in attending the patient after the operation. This charge really involves two separate principles of law, which principles will now be separately discussed.

■ With regard to abandonment both plaintiff and defendant rely in their trial briefs on the authorities found in 57 A.L.R.2d 434. It is there stated that "To constitute an abandonment, the termination of the relationship between physician and patient must have been brought about by the *unilateral act of the physician*. There can be no abandonment if the relationship is terminated by mutual consent, or by the dismissal of the physician by the patient", at page 436, citing cases. (Emphasis added.)

It is clear that as applied to the instant case, this test has not been met. Al-

though instructed by Dr. Wood to return in two weeks, Mrs. Roberts decided that the November 11, 1959, visit was to be her last. Having thus decided and acted accordingly, plaintiff cannot now be heard to complain that the defendant abandoned her as a patient.

With regard to the charge that defendant failed to exercise due diligence in the post-operative period, plaintiff seems to rely on some inexorable duty on the part of the defendant to employ therapy or corrective surgery to remedy the worsening speech impediment. The facts of the case and the expert opinions expressed at the trial indicate that such treatment or surgery was neither necessary nor proper.

All of the doctors except one expressed the view that unilateral paralysis of abduction should not result in an inability to use the true vocal chords. The medical literature introduced into evidence sustains this view. The following language is quoted from page 182 of the book Practical Aspects of Thyroid Disease, written by Dr. George Crile, Jr., and is typical of other works: "When a vocal chord is paralyzed by injury to the recurrent nerve, it falls toward the midline and assumes the 'cadaveric' position. * * * The voice may never be as strong as it was before the operation, but a speaking voice always returns. Persistent aphonia is a sign of hysteria, not of injury to the recurrent nerves."

One witness, Dr. James G. Donald, told of one instance in which he deliberately removed the recurrent nerve; and although one chord is completely immobile, that patient speaks with a normal voice. This example was related to reaffirm the belief among doctors that the voice always returns where the patient suffers unilateral abductive paralysis. The mystery lies in the fact that such has not been the result in Mrs. Roberts' case. A satisfactory explanation of this is wanting, although the inference of the testimony is that the patient needs speech therapy and/or psychiatric care to restore to her confidence in being able to use her true vocal chords. The fact that

Dr. Wood did not initiate such therapy or recommend that she consult a specialist while under his care, cannot be the basis for liability unless such omission constitutes negligence.

Turning once again to the expert testimony and the medical literature to determine the surgeon's expected reaction to unilateral abductive paralysis, we approach a grey zone wherein the course to be followed is a decision left to the *expertise* of the particular surgeon faced with that patient and under the peculiar circumstances of that situation. The testimony shows that it is not unreasonable for the physician to hope for spontaneous recovery up to six months after the paralysis becomes manifest. Dr. Wood's diagnosis of the patient during the interim between June and November was that Mrs. Roberts had a hoarseness and was using her true vocal chords throughout this period. This diagnosis has not been impeached by the evidence. In fact the evidence shows that while paralysis usually occurs soon after the operation it may be delayed several months. In addition, the examination report of the plaintiff from Dr. Winstead, one of plaintiff's witnesses, dated September 23, 1959, addressed to Dr. Wood, fails to state that the nerve was at that time paralyzed, although again reference was made to the hoarseness of her voice and the fact that the chord did not move completely to the mid-line. Another of plaintiff's doctors, Dr. Robinson, testified that his examination at this same time revealed a sluggishness in the right chord in moving to the mid-line. It would not be unreasonable to assume that a progressive fixation in scar tissue was gradually choking off the nerve impulse. Be that as it may, however, not one of the doctors stated that he would have done something Dr. Wood did not do, or not have done anything Dr. Wood did during this five-month period. In response to a question from the Court, Dr. Donald did state that on September 24 he would have hoped for spontaneous recovery; but if the condition persisted for a few months beyond that time, he would have had the

586

chords examined and probably recommended speech therapy. The fact is, however, the plaintiff visited the defendant two or three times thereafter and then stopped seeing him. Under these circumstances I fail to see wherein the defendant is guilty of a lack of diligence in treating the plaintiff. On the contrary, the record shows that he was fully cooperating with other doctors attending the patient and doing his best to help restore her normal voice.

The results of Mrs. Roberts' operation are, of course, most unfortunate, but I fail to see any negligence on the part of the defendant.