## Chesapeake & Ohio Railway Company v. Walker's Administrator.

(Decided May 27, 1914.)

### Appeal from Carter Circuit Court.

1. Railroads—Jerking or Bumping in Movement of Freight Trains.— In the absence of a showing on the part of the plaintiff that those in charge of a railroad train had violated some duty to the plaintiff, or had given to the train some unusual or unnecessary jerk or bump, no recovery can be had, it being well recognized that in the movement of freight trains there is always more or less jerking or bumping.

2. Railroads—Jerk in Movement of Freight Trains.—A jerk in the operation of a heavy freight train may be violent, and nevertheless necessary and usual in such operation.

3. Railroads—Risks Assumed by Switchmen or Brakemen.—Those who accept employment in the capacity of switchmen or brakemen, and whose duty requires them to be on and about the cars, are fully advised as to the risks incident to their employment; and, in accepting such employment, they assume the risks ordinarily incident to the business, and if injury or death result from such ordinary risk, no recovery can be had.

4. Master and Servant—What Servant Must Show Before He Can Recover of Master.—Before the injured servant can recover damages from his master, he must show that his injury was caused by some neglect on the part of the master, or some other servant of the master, which is imputed to him; it is not enough to show that the plaintiff sustained the injury while in the service of the master.

5. Master and Servant—When Servant Cannot Recover.—Where the circumstances attending the injury show nothing as to the real cause, but leave it to conjecture as to whether it was the negli-

gence of the master or the fault of the injured servant, or an unaccountable accident, there is such a failure of proof that no recovery can be had.

SHELBY, NORTHCUT & SHELBY, WILHOIT & WILHOIT and H. L. WOODS for appellant.

H. R. DYSARD for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

This action was brought by James Walker's administrator under the provisions of the act of Congress of April 22, 1908, known as the Employers' Liability Act, to recover damages for negligently causing the death of Walker while in the service of the appellant, as a brakeman. The trial resulted in a judgment for $12,000.00, which the jury apportioned equally between the widow and the two infant children of Walker. The company appeals.

Walker was twenty-nine years old and prior to September 4, 1912, he had worked, first as a farmer, and later in a fire-brick yard at Olive Hill, Kentucky. On September 4, 1912, he applied to appellant's trainmaster for a position as brakeman. The trainmaster gave him a pass or note addressed to appellant's freight conductors, authorizing them to permit Walker to travel over the Lexington division of the road for the purpose of learning the duties of a brakeman. In about four or five days thereafter Walker returned the pass, signed by a number of appellant's freight conductors, showing that he had gone over the road on their trains; and the trainmaster, having satisfied himself that Walker was qualified to perform the duties of a brakeman, employed him.

Walker went to work about September 8th, and was killed on the night of September 26, 1912, less than three weeks after he entered appellant's service. At the time of his death Walker was the front brakeman on a "pickup" freight train running from Ashland to Lexington, Kentucky, of which James McDonald was conductor, Fred. Fields rear brakeman, G .W. Sanders engineer, and Glenn Dooley fireman. The train was composed of thirteen heavily loaded gondola cars and a dead engine in charge of Charles Porter, a machinist.

Walker rode into Olive Hill on the engine, and when the train arrived there about midnight it stopped first

at the water tank east of the station. While the engine was taking water McDonald, the conductor, walked west past the tank to the depot for the purpose of leaving way-bills which covered cars which were to be set off there, and to get way-bills for cars that were to be picked up. As he went to the station he saw Walker standing near the engine. After taking water the train started west towards the tracks in which the switching was done; and as the engine passed the station McDonald saw Walker standing in the gangway of the engine behind Sanders, the engineer. In this McDonald is corroborated by Sanders, who says Walker was on the gangway behind him after the train had pulled up from the depot in the west of the yard; and the last time Sanders saw Walker before the accident was when they were going to the west end of the yards and Walker, who was still standing in the gangway, tapped Sanders on the shoulder and said something to him about picking up and setting off cars.

The train stopped in the west end of the yards and McDonald, the conductor, cut it in two eight cars back from the engine. The engineer then took the engine and the eight cars further west, beyond the connection between the main line and the passing track, and backed the train in on the passing track, where two cars were cut off and shoved in on the east storage track. The train then went west again beyond the end of the switches until the end of the rear car was west of the entrance to the west storage track. It then stopped and backed east on this track and another car was cut off.

The track at this point curves to the south on the left-hand or fireman's side of the engine, and all signals given by the trainmen were received by the fireman and repeated to the engineer, who could not, from his position on the right of the engine, see the signals. After the car last mentioned had been shoved onto the west storage track McDonald signaled for the train to move forward again, but as this signal was not acted upon by the engineer, McDonald went forward to see what was the matter, and learned that Sanders, the engineer, had discovered Walker's body lying between the rails of the main line and immediately in front of the engine. Sanders had not seen Walker since just before the switching began, when Walker spoke to him in the gangway of

the engine. Walker was fatally injured and lived about a half hour, dying before a doctor could reach him.

No one saw the accident, but when Walker was asked by the engineer and the conductor how he happened to get hurt he said he fell between the cars. As McDonald went toward the engine to learn what was the matter, he found Walker's hat and lantern lying between the main line and the passing track at a point between seventy and ninety feet from Walker's body; and at that point McDonald and other witnesses also noticed, between the rails of the main line and near the southern rail, evidence, that Walker's body had been dragged along the track. The distance from the point where Walker's hat and lantern were found and where the first evidence of his dragged body appeared, back to the west end of the cars left on the main line was, according to McDonald's testimony, over 300 feet.

And while McDonald says Walker's body was dragged from 70 to 90 feet westwardly, Henderson says it was dragged about 300 feet, as shown by the remains of Walker's body scattered along the track. Walker was badly cut up by the train, the undertaker having found pieces of his limbs ninety-seven steps east of where his body was found. Evidently he had fallen between the cars and had been dragged at least that distance by the wheels and brake-beams of the cars. It is not known or shown whether more than one car passed over him, as no one testified to having seen him between the time he spoke to Sanders in the gangway of the engine and the time when his body was subsequently discovered by Sanders on the track.

Fields, the rear brakeman, died before the trial.

The petition alleged three grounds of negligence as the basis of a recovery: (1) That the engineer in charge of the train negligently started or stopped it with an unusual and unnecessary jerk, which threw Walker from the train and caused his death; (2) that the appellant negligently placed Walker in a dangerous employment and in a dangerous position without warning him of the danger and before he had sufficient experience or knowledge to guard against the danger; and (3) that the employees of appellant in charge of the train saw, or by the exercise of ordinary care, could have seen Walker when he fell beneath the train and by the exercise of ordinary care they could have prevented his death.

For a reversal, appellant contends (1) there was no proof of negligence in either of the three respects alleged, and that its motion for a peremptory instruction should have been sustained; (2) that there was error in the instructions; and (3) that the verdict is excessive, there being no proof of loss to support it.

Appellant's first ground of reversal requires a careful examination of the testimony relating to the three grounds of negligence alleged in the petition.

Four witnesses, Porter, Eidson, Claude Henderson and Osenton, testified for plaintiff upon the question of the jerk of the train.

Porter was in charge of the dead engine which belonged to the Southern Iron Equipment Company of Atlanta. He was called as a witness for the plaintiff, and in speaking of the switching of the train he testified that they "handled it pretty rough."

Edison was at home in bed about thirty-five yards from where Walker's body was found, and was awakened by the train which was "pulling and jerking as it starts out;" and when asked if it was a usual or an unusual start, he answered, "I wouldn't say; they make right smart noise sometimes."

Claude Henderson and Osenton were standing together about 100 feet from the track, when he heard a "jerk" of the train—"a sudden crashing of the cars of the train, and saw the light go down" at about the same place where the first signs of flesh upon the rail were found, although he did not see any one on top of the cars. He further said the jerk was "unusual."

Osenton says the jerk was "unusual;" and when asked if it was a hard jerk, he answered, "Yes, sir, it was a hard jerk," and that he saw a light fall.

On the other hand, Sanders, Dooley and McDonald testify that while there was the usual jerking that always and necessarily attends the switching of heavily loaded freight cars. there was no unusual jerking of the train.

It will be seen that the effect of appellee's testimony is that there was a rough or unusual jerking of the train; no one says it was unnecessary in the operation of the train.

In C., N. O. & T. P. Ry. Co. v. Goldston, 156 Ky., 415, we said: "A jerk in the operation of a heavy freight train might be violent, and nevertheless necessary and usual

in such operation.'' L. & N. R. R. Co. v. Fox's Admr., 20 Ky. L. R., 81, 42 S. W., 922; Yates v. Miller Creek Construction Co., 28 Ky. L. R., 332, 89 S. W., 241; Groves v. L. & N. R. R. Co., 29 Ky. L. R., 725, 96 S. W., 439; L. & N. R. R. Co. v. Greenwell's Admr., 125 S. W., 1056, and Patterson's Admr. v. L. & N. R. R. Co., 138 Ky., 648, are to the same effect.

In L. & N. R. R. Co. v. Fox's Admr., *supra,* we said:

''The fact that there was a 'pretty hard jerk,' or a 'hard jerk,' at the time deceased fell, does not establish the fact that it was caused by the negligent conduct of those in control of the train. Such jerks may result from the usual movement of the trains. Negligence is never presumed. It is a fact that must be proven.''

The first ground of negligence was not sustained by the proof.

Neither can it be said that the charges that appellant was negligent in putting Walker to work in a dangerous place without instructing him of the danger, and that it failed to use due care in preventing the accident after Walker's peril was discovered, are sustained by any evidence. Walker was 29 years of age and knew the nature of the employment he had undertaken. That it was a dangerous work is only stating a truth that is evident to everybody. That fact, however, does not of itself render the master liable in case of injury to the servant.

In L. & N. R. R. Co. v. Greenwell's Admr., 125 S. W., 1056, we said:

''This court has repeatedly passed upon questions of this character, and it has uniformly held that, in the absence of a showing on the part of the plaintiff that those in charge of the train had violated some duty to the deceased, or had given to the car some unusual or unnecessary jerk or bump no recovery could be had. It is well recognized that in the movement of freight trains, there is always more or less jerking or bumping, and those who accept employment in the capacity of switchmen or brakemen, and whose duty requires them to be on and about the cars, are fully advised as to the risks incident to their employment, and, in accepting such employment, they assume the risks ordinarily incident to the business, and, if injury or death result from such ordinary risk, no recovery is allowed.''

There is no evidence that Walker did not know the risk ordinarily attendant upon the work of a freight

brakeman. The testimony to the effect that it would take a man from thirty days to one year to learn how to protect himself in working as a brakeman, without any specific act of negligence shown against appellant, only goes to show that the work is inherently dangerous, and that some persons are more careful than others in avoiding injury to themselves. And, while that is true of all dangerous employments, it does not follow that the master cannot employ a servant, or that the servant should not begin work, until he has learned as much as he will ever learn, in the way of taking care of himself. There must be some negligence on the part of the master, before he can be made liable.

The claim that appellant's employees could have prevented the injury to Walker after discovering his peril, is based upon the testimony of Henderson and Osenton that they "saw the light go down," or "saw the light fall;" it being thereby meant that they saw Walker's lantern fall when the cars jerked; and the testimony of Porter that Sanders, or some one, said the same thing, when they had gathered around Walker's body about fifteen or twenty minutes after it had been discovered. Clarence Henderson also said that Sanders and McDonald, the conductor, made such a statement at the same time.

Sanders denied having made any such statement, and upon further examination Porter would not be positive as to who made the statement. The transcript shows that McDonald testified as follows:

"Q. You never saw him drop off the car? Ans. I saw his lantern go out. I never saw his lantern."

The context shows that McDonald did not intend to be understood as saying he saw Walker's lantern go out; he evidently meant the contrary. Moreover, these statements, if made by Sanders and McDonald, were not a part of the *res gestae,* and were, therefore, incompetent. Early's Admr. v. L., H. & St. L. Ry. Co., 115 Ky., 19.

There is no evidence, however, that any one knew where Walker was, or what he was doing, or that anyone saw him after he left the gangway of the engine behind Sanders. It is all conjecture as to the cause of his fall between the cars. Walker may have been entirely to blame, or the blame may have been entirely upon the company, but neither possibility of itself justifies a recovery.

This case is quite like Hurt v. L. & N. R. R. Co., 116 Ky., 546, where we said:

"Before the injured servant can recover damages from his master, he must show that his injury was caused by some neglect on the part of the master, or some other servant of the master, which is imputed to him. It is not enough to show that the plaintiff sustained his injury while in the service of the master.

"Where the circumstances attending the injury show nothing as to the real cause, but leave it to conjecture as to whether it was the negligence of the master or fault of the injured servant or unaccountable accident, there is a failure of proof."

L. & N. R. R. Co. v. Vititoe's Admr., 19 Ky. Law Rep., 612, 41 S. W., 269, and Early's Admr. v. L., H. & St. L. Ry. Co., 115 Ky., 21, are to the same effect.

Such is the case here. Under the proof, which wholly failed to show any negligence on the part of appellant's employees, its motion for a peremptory instruction should have been sustained.

Judgment reversed for a new trial.

Judge Hannah not sitting.