(89 South. 70)

## ST. LOUIS & S. F. R. CO. v. DORMAN.
### (6 Div. 936.)

(Supreme Court of Alabama. Jan 20, 1921. Rehearing Denied April 21, 1921.)

**1. Death ⊚⇒49(I)—Complaint under federal act must allege existence of beneficiaries.**

A complaint under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665), for the death of a railroad employé, which does not show that a widow, children, or other dependent relatives survived deceased, is defective.

**2. Master and servant ⊚⇒256(3)—Complaint insufficient to show injury in performance of duty.**

A complaint alleging that defendant railroad company engaged in interstate commerce, and that the intestate was killed while in the employment of defendant and while employed in said commerce, is insufficient to show that the intestate was killed while engaged in the performance of the service for which he was employed or which was imposd upon him by his employment.

**3. Appeal and error ⊚⇒1040(10)—Overruling of demurrer to defective complaint held prejudicial error.**

Where the complaint under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) was defective in failing to allege that deceased was engaged in the performance of the service for which he was employed at the time of his death, the erroneous overruling of a demurrer was not harmless where no evidence was offered which tended to show that deceased was so engaged when killed; the oral instructions merely requiring a showing that plaintiff at the time of his death was engaged in the employment of defendant.

**4. Evidence ⊚⇒574—Hypothetical testimony insufficient to show negligence in stopping train.**

In an action for death of a brakeman whose body was found at the end of a pier near point where the train had stopped for water, expert testimony given hypothetically *held* insufficient to establish negligence in stopping train so as to precipitate him therefrom, or·contradict the engineer's testimony that he did not make an emergency stop.

**5. Master and servant ⊚⇒213(4)—Risk of emergency stop assumed by brakeman.**

There can be no recovery for the death of a brakeman who was thrown from a train as the result of an emergency stop which was not shown to be improper under the circumstances, the train being stopped at the place desired, for such jars and jerks are assumed as part of the risk of the employment, particularly where it was apparent from the place deceased was discovered he could not have been at his post of duty, the rear caboose, at the time of the stop, if he was then thrown from the train, but must have been further up on one of the cars.

**6. Master and servant ⊚⇒265(6)—Doctrine of res ipsa loquitur inapplicable.**

In an action for the death of railroad brakeman found at a point where he was thrown or fell from the train, the doctrine of res ipsa loquitur does not apply, but the fact of negligence must be affirmatively shown.

**7. Master and servant ⊚⇒276(11)—Evidence leaving cause of injury to conjecture insufficient.**

Where it was merely conjectural whether death of a servant resulted from negligence for which the master was liable or from other cause, there can be no recovery.

Appeal from Circuit Court, Jefferson County; Dan A. Greene, Judge.

Action by Mrs. Rhoda Dorman, as administratrix of the estate of George M. Dorman, for the damages for the death of said Dorman, against the St. Louis & San Francisco Railroad Company, the action being under the federal Employers' Liability Act. Judgment for the plaintiff, and defendant appeals. Reversed and remanded.

The trial was had on count 2 of the complaint, which is as follows:

"Plaintiff, who sues as the administratrix of the Estate of George M. Dorman, deceased, claims of the defendants $100,000 damages for that on, to wit, July 22, 1917, plaintiff's intestate, while in the employment of the defendant, St. Louis & San Francisco Railroad Company, a common carrier by railroad then and there engaged in carrying freight for hire between Birmingham, Ala. and Amory, Miss., and while employed by said defendant in said commerce, was killed in the county of Jefferson, state of Alabama, as follows: Plaintiff's intestate, while a flagman on a train bound from Birmingham, Ala., to Amory, Miss., which train at said time was carrying freight for hire between said points in Mississippi and Alabama, was caused

_____

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

to fall from said train and was killed by said fall near Palos, Jefferson county, state of Alabama. Plaintiff avers that the death of her intestate resulted in whole or in part from the negligence of W. F. Lange, then and there an employee of the defendant, St: Louis & San Francisco Railroad Company, and while acting within the line and scope of his employment as such employee of said defendant, which negligence consisted in this: Said Lange so negligently stopped said train as to negligently cause intestate to be precipitated therefrom."

The demurrers raised three points: (1) That the count stated no cause of action under the federal Employers' Liability Act; (2) that the complaint did not show that at the time of his death Dorman was engaged in interstate commerce; (3) that the complaint failed to show that at the time Dorman fell from the train he was performing duties under his employment in interstate commerce. These demurrers were overruled, and issue was joined on the plea of the general issue and assumption of risk.

The only witness who testified as to the facts of the case as related to the accident was the engineer, Lange, who was in charge of the train and who was called as a witness by the plaintiff. The following facts are without dispute: The intestate, Dorman, was the rear brakeman or flagman on one of defendant's freight trains between Birmingham, Ala., and Amory, Miss. This train left Birmingham before sunrise in the morning, and the last time Dorman was seen alive, so far as the record shows, was at East Thomas, just out of Birmingham. The train stopped at Palos, about 15 miles away after daylight, to take on water for the engine, and then proceeded to Jasper, where Dorman's absence from the train was first discovered. Palos is just west of the Little Warrior river, which is crossed by the railroad bridge, and Dorman's body was found at the foot of one of the piers of this bridge on the west side next to Palos, about 19 car lengths from the water tank, the water tank being 11 car lengths west of the bridge, and the bridge being about 18 or 19 car lengths in length. The train in question consisted of the engine, 28 loaded freight cars, and the caboose, upon which the duties of Dorman's employment required him to be, he having no duties which called him to any other part of the train. The average length of freight cars such as these is approximately 42 feet from coupler to coupler. With respect to his operation of the train, preliminary to his stop for water at the tank, the engineer, Lange, testified as follows:

"As I approached the trestle, I was going about 20 miles an hour. I made several application of the brakes to my train, as I made the stop at the tank at Palos. When I made the first application I was tipping over the hill from Coal Creek. The top of the Coal Creek hill is about a mile and a quarter from the trestle, about a mile from the south or east end of the trestle, it is down grade from the top of the hill to the trestle, and it is about level from the trestle to the water tank. I then made a service application. A service application is drawing the air out of the train line gradually. I did it to steady my train. It would have gotten too great speed if I hadn't done it going down the grade. I applied the brakes at the trestle, service application of the air. I applied 10 pounds then, and didn't make any more application. I made one as I came over the top of the hill, and I made another of 10 pounds when I got to the trestle. It stopped me at the water tank. I did not go beyond the water tank. After I stopped at the water tank I took water. I did not see anything that was wrong. I stopped right at the water tank, and didn't have to move the engine after I stopped. I turned my water right on then. I hit right at the spot."

In further explanation he said:

"On the engine that I was operating on this occasion I had 70 and 90 pounds of air available for use on the air brake. That means 70 pounds in the train line and 90 pounds in the main auxiliary. There is a connection between the air in the train line and the air in the main reservoir. The main reservoir is on the engine and is an extra supply—excess pressure of the air; it is in case you want to use your air. There are 90 pounds of air stowed away in the reservoir on the engine to recharge your train line after you use your air, after you use some of the air out of your train line. The air in the train line is used to operate the automatic brakes. In making the stop for the Palos water tank on this occasion there were two different brakes used. I made two applications of the brakes in making the stop. I tipped over Coal Creek hill about 30 miles an hour. Coal Creek is about 2½ miles from Palos. I was going pretty lively and the road was crooked, and there was a yard limit at Palos which I had to approach under control; so, after tipping over the hill, I made a reduction of about 10 pounds in order to steady my train. By the time I passed through Bessie [a junction point on the railroad about 1½ miles from the south end of Palos bridge] I had my train down to about 20 miles an hour. I released my brakes and I held my train with the driver brake on the engine. I have got a feature on the locomotive that will release the brakes on the train and hold the brakes on the engine and tank; and I left the driver brakes set until I got to Palos. That means that I just almost held my speed of 20 miles an hour from Bessie, which is down hill, to Palos, then when I got on to the bridge I made another reduction of the train line. In the meantime my train line was recharged again to seventy pounds. I released my brakes when I first tipped over the hill. My train line was recharged again."

The testimony of other witnesses explains that the release of the brakes allows a recharging of the air in the train line in from two to four minutes, thereby making the brakes again available for use through application of the air.

Lange further testified:

"I had 70 pounds in my train line again and still steadying my train with the driver brake and that bunched my train. The cars were all bunched when I tipped over the hill, when I made the first application. By my train being bunched I mean that there is a certain amount of slack in the cars, the springs; some of them are weaker and some of them are stouter, and there is a certain amount of slack in the train, and it has got to be there or else you couldn't keep these trains together. The effect of bunching the train is that it will make one car bump up against the other. My train was bunched about half a mile before I got to the south end or the Birmingham end of the Palos bridge on the occasion that I made this stop. I made an automatic application of the air of 10 pounds. That is called a service application. After making that service application I did not make any other application to stop at the water tank. After making the service application of 10 pounds of air, it is not possible to make an emergency stop. You cannot make an emergency stop after you have weakened your train line. You have got to have 70 pounds in the train line in order to make an emergency application; otherwise you cannot make an emergency application from a service application. After you have made a service application you have to recharge your train line before you can make an emergency stop. I made my service application that I spoke of when my train reached the trestle; that is, when the engine reached the trestle."

Plaintiff examined four other witnesses, three of whom were locomotive engineers of experience, and the other a railroad employé, upon hypothetical questions, which were designed to show that the air brake applications which Lange testified he made to his train and thereby brought his engine to a stop right at the tank would not have been effective to do so, and that with such applications his engine would have gone beyond the tank, and that at the tank would have required an emergency application, the result of which would have been a sudden jar to the caboose and other cars in the rear. This testimony is sufficiently discussed in the opinion of the court. The evidence showed that plaintiff was the surviving widow of her intestate, and that she was dependent upon him for support. The defendant requested the general affirmative charge and several special instructions, which were refused, and there was verdict and judgment for the plaintiff in the sum of $15,000.

Johnston & Cocke, of Birmingham, for appellant.

The complaint was subject to the demurrers, for the reason that it failed to allege that the decedent left surviving dependents entitled to the fruits of the recovery under the provisions of the Federal Act. 235 U. S. 308, 35 Sup. Ct. 32, 59 L. Ed. 242; 227 U. S. 59, 33 Sup. Ct. 192, 57 L. Ed. 417, Ann. Cas. 1914C, 176; 227 U. S. 145, 33 Sup. Ct. 224, 57 L. Ed. 456; 228 U. S. 173, 33 Sup. Ct. 426, 57 L. Ed. 785; 223 U. S. 248, 32 Sup. Ct. 220, 56 L. Ed. 419, 38 L. R. A. (N. S.) 57; 157 Ky. 590, 163 S. W. 752; 74 Wash. 397, 133 Pac. 609, L. R. A. 1916C, 800; 85 N. J. Law, 491, 89 Atl. 990; 153 Ky. 363, 155 S. W. 1119, 47 L. R. A. (N. S.) 31; 20 Ga. App. 49, 92 S. E. 390. Also for failing to aver that the employee was engaged in the performance of duties under his employment in interstate commerce. 233 U. S. 473, 34 Sup. Ct. 646, 58 L. Ed. 1051, Ann. Cas. 1914C, 163; 169 Ala. 389, 55 South. 989, Ann. Cas. 1912B, 366; 166 Ala. 449, 51 South. 987; 159 Ala. 185, 48 South. 664; 162 Ala. 619, 50 South. 146. There was no proof that the engineer was negligent, or, if negligent, that intestate's death resulted therefrom. 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361; 183 Ala. 132, 62 South. 757; 163 Ala. 240, 50 South. 996; 182 Ala. 669, 62 South. 527; 35 N. E. 89; 91 Ky. 526, 16 S. W. 275; 69 N. H. 285, 46 Atl. 467. The sudden application of air is not negligent, unless the engineer knows or has reasonable cause to believe that the safety of other employees will be endangered. 110 Ala. 185, 20 South. 325; 99 Ala. 346, 12 South. 612; 148 Ala. 153, 41 South. 856; 164 Ala. 103, 51 South. 147; 198 Ala. 311, 73 South. 550. The doctrine of res ipsa loquitur does not apply. 148 Ala. 665, 41 South. 634; 107 Ala. 400, 18 South. 30; 192 Ala. 665, 69 South. 73; 196 Ala. 113, 72 South. 17; 247 U. S. 367, 38 Sup. Ct. 535, 62 L. Ed. 1167; 200 U. S. 480, 26 Sup. Ct. 303, 50 L. Ed. 564.

Brown & Denson, of Birmingham, and J. J. Mayfield, of Montgomery, for appellee.

The rules of practice and procedure of the forum govern an action of this character. 241 U. S. 485, 36 Sup. Ct. 630, 60 L. Ed. 1117, L. R. A. 1917F, 367; 196 Ala. 25, 71 South. 335; 1 Robert's Fed. Liability, § 427. The complaint was sufficient. 33 Ala. 642; 16 Ala. App. 633, 80 South. 736; 207 Fed. 311, 125 C. C. A. 55. The proof cured the infirmity arising from lack of averment as to the pecuniary loss to the widow. 202 Ala. 599, 81 South. 339; 207 Fed. 314, 125 C. C. A. 55. The absence of averment of pecuniary loss was cured by the positive instructions of the court. 192 Ala. 534, 68 South. 417, Ann. Cas. 1917D, 929; 184 Ala. 420, 63 South. 992, and authorities supra. The evidence was sufficient to establish the negligence. 95 Ala. 397, 11 South. 341; 98 S. C. 348, 82 S. E. 433; 69 Iowa, 450, 30 N. W. 25, 58 Am. Rep. 227; 191 U. S. 64, 24 Sup. Ct. 24, 48 L. Ed. 96; 77 Ga. 393, 3 S. E. 307; 4 A. & E. Enc. of Law, 76.

SOMERVILLE, J. [1] The complaint in this case is framed under the federal Employers' Liability Act (35 U. S. Stat. 65; U. S. Comp. St. §§ 8657–8665). It not only con-

tains no allegation that the action is brought for the benefit of a surviving widow, or children, or other relatives, who were dependent upon the decedent, or who reasonably expected actual pecuniary benefit from him if he had remained alive; but it does not even show that a widow, or children, or other relatives in fact survived him. Such showings are necessary under the statute, since otherwise no cause of action survives, and the administrator is not authorized to recover. As said in Gulf, Colorado, etc., Ry. Co. v. McGinnis, 228 U. S. 173, 175, 33 Sup. Ct. 426, 57 L. Ed. .785:

"In a series of cases lately decided by this court, the act in this aspect has been construed as intended only to compensate the surviving relatives of such a deceased employé for the actual pecuniary loss resulting to the particular person or persons for whose benefit an action is given. The recovery must therefore be limited to compensating those relatives *for whose benefit the administrator sues* as are shown to have sustained some pecuniary loss." (Italics supplied.)

In the more recent case of Garrett v. L. & N. R. R. Co., 235 U. S. 308, 35 Sup. Ct. 32, 59 L. Ed. 242, the court had under consideration the sufficiency of complaints in this respect under the federal act. It was there said:

"Where any fact is necessary to be proved in order to sustain the plaintiff's right of recovery, the declaration must contain an averment substantially of such fact in order to let in the proof. * * * Although the same precision of statement is not required [in equity] as in pleadings at law, nevertheless it is held to be absolutely necessary that in bills of equity such a convenient degree of certainty should be adopted as may serve to give the defendant full information of the case which he is called upon to answer. Every bill must contain in itself sufficient matters of fact, per se, to maintain the plaintiff's case; and if the proof go to matters not set up therein, the court cannot judicially act upon them as a ground for decision, for the pleadings do not put them in contestation."

This rule was applied to the third count of the complaint in that case, which alleged the survival of father, mother, 'brothers, and sisters, and that "plaintiff, as administrator of the said decedent, sues the defendant in the sum of," etc.; and the conclusion was that "the third count of the declaration under consideration states no cause of action."

In Thomas v. Chi. & N. W. Ry. Co. (D. C.) 202 Fed. 766, it was held that a complaint which failed to allege that decedent left surviving him any person for whose benefit a right of action was given by the statute did not state a, cause of action.

In Farley v. N. Y., etc., R. R. Co., 87 Conn. 328, 87 Atl. 990, the same conclusion was pointedly declared, and it was observed that there can be no presumption indulged to supply the want of allegation. And to the same effect is Melzner, Adm'r, v. N. P. Ry. Co., 46 Mont. 277, 127 Pac. 1002. Under these authorities it is clear that the complaint before us did not state a cause of action under the federal act, and the demurrer' should have been sustained as to that insufficiency.

[2] The complaint alleges that the defendant was engaged in interstate commerce, and that the intestate was killed "while in the employment of the defendant," and "while employed by said defendant in said commerce." It does not allege that intestate was killed while he was engaged in the performance of the service for which he was employed, or which was imposed upon him by his employment.

It has been repeatedly held by this court, and it must be regarded as a settled rule of pleading, that an allegation merely that the injury occurred while the plaintiff, or his intestate, was in the service or employment of the defendant, is not sufficient, against apt demurrer, to show the condition, essential to liability, that the injury occurred while he was engaged in the performance of the service which he was employed to do, or which was imposed upon him by his employment. Green v. Bessemer C., I. & L. Co., 162 Ala. 609, 50 South. 289; Adams v. So. Ry. Co., 166 Ala. 449, 51 South. 987; St. L. & S. F. R. R. Co. v. Sutton, 169 Ala. 389, 401, 55 South. 989, Ann. Cas. 1912B, 366; W. U. T. Co. v. Howington, 198 Ala. 311, 73 South. 550. A late case recognizing the rule, while holding the allegations sufficient, is Ala. F. & I. Co. v. Ward, 194 Ala. 242, 69 South. 621.

[3] Under these authorities it must be held that the grounds of demurrer which challenged the sufficiency of the complaint in this respect were well taken, and the demurrer should have been sustained. The error in its overruling cannot be pronounced harmless, since no evidence was offered by plaintiff which tended to show that the intestate was when killed engaged in the performance of the duties of his employment; and the oral instructions given by the trial judge to the jury are in accord with his ruling on the demurrer, viz. that, in order to recover, plaintiff must show "that at the time of the death of her intestate he was in the employment" of defendant—a different thing from being engaged in performing the duties of that employment. It is clear, therefore, that plaintiff was erroneously relieved of her proper burden of establishing by some competent and relevant evidence an essential element of her cause of action.

[4] The gravamen of the complaint is the alleged negligence of defendant's engineer, Lange, in so stopping his train "as to negligently cause intestate to be precipitated therefrom."

The theory of plaintiff's counsel is that Lange stopped his train suddenly and sharp-

ly at the water tank at Palos by throwing it "in emergency"; that is, by making what is known as an emergency application of the air brakes, which, under their full power, would ordinarily result in a more or less violent jar to the cars, especially towards the rear end, and that this jar or jerk was sufficient to cause, and did in fact cause, the intestate to be thrown from the train to his death at the base of the pier where he was found.

The testimony of Lange, who was examined as a witness for plaintiff, considered per se, completely and explicitly refutes that theory, and disproves the allegation of the complaint as to negligence.

But plaintiff conceives, and the trial court ruled, that the testimony of the four witnesses, one or all of them, who were examined by plaintiff as experts, tended to contradict Lange's testimony that he stopped his train at the water tank by two successive service applications of air, aided by the application of the driver brake on his engine, without resorting to an emergency application of the air.

We have examined all of this testimony with painstaking care. It was given in response to hypothetical questions, and, upon the hypotheses stated, it tended to the conclusion that such a train, moving at such a speed, could not have been stopped within the distance in which Lange testified he had stopped it. If these hypotheses had fairly and fully covered the conditions under which Lange testified his stop was accomplished, the testimony elicited would undoubtedly have presented such a conflict with the testimony of Lange as to make the manner and means of his stop a question of fact for the jury.

But the hypotheses presented to these witnesses are variant from the actual conditions shown by Lange in two particulars, one or both, each of which is presumptively material and important: (1) They omit the factor, vitally affecting the braking power of the air service, that, after the first application of 10 pounds about a mile and a quarter from the tank, the line was recharged from the reservoir, thereby restoring its braking power to the basis of a first service efficiency, before the second service was made as the train approached the bridge; and (2) they omit the factor of the application of the special locomotive brake while the air brakes were released and the line recharged, whereby the cars were bunched together, the slack at the coupler being removed, and the movement of the train steadied, about half a mile east of the trestle.

In some instances the hypotheses presented by the questions are not disclosed by the answers, but the answers do not disclose any consideration by the witness of the factors mentioned above.

For this reason we do not think that the hypothetical testimony relied upon as a material contradiction of the testimony of Lange can be accorded that effect; and, Lange's testimony remaining without material contradiction, the negligence allegation of the complaint is without support.

[5] But, conceding for the argument that the jury might have found, from contradictory testimony before them, that Lange stopped his train at the tank only by an emergency application, and that this produced a jar capable under some conditions of causing a brakeman to fall from the train, it is insisted by appellant that there is nothing in the evidence which tends to show that such an application of the air brakes as a means of stopping the train was an act of negligence and breach of duty to this intestate. The mere fact that it would produce a violent and unusual shock to the cars in the train does not alone support the imputation of negligence.

With respect to jerks or shocks in starting trains, this court has made the following observations, which have some bearing on the present question:

"It is a matter of common knowledge that jerking and jarring, with more or less violence, necessarily attend the handling of locomotives and cars under the circumstances * * * shown in the evidence in this case [switching cars in the yard], and it cannot be, as a matter of law, questioned that the plaintiff assumed the risks incident to the usual and customary performance of his duty as switchman under his said complaint." L. & N. R. R. Co. v. Smith, 129 Ala. 553, 561, 30 South. 571, 574.

"Sudden and even violent jerks and shocks may be necessarily incident to the starting and movement of railroad cars operated by steam, however careful may be those in charge of the engine, and of all such sudden movements, not caused by negligence, the employee assumes the risk. But the employé does not assume any risk of sudden unnecessary movements, even though they be of no more than ordinary violence, which are caused by the negligence of the engineer in the handling of the train. * * *" H. A. & B. R. R. Co. v. Miller, 120 Ala. 535, 543, 24 South. 955, 958.

"It is common knowledge, and also shown by the evidence in this case, that the several cars in a freight train are brought into motion by a jerk occasioned by sudden taking up of the slack between them as the momentum of the engine is communicated from one car to another. Jerking with some degree of violence may therefore be said to be generally necessary and incident to the starting of such trains, and the fact that it occurs in a given instance with that degree of violence which is usual *under the particular circumstances* as to grade, character of cars, and the like, is no evidence of negligence in setting the train in motion." (Italics supplied.) B'ham. Min. R. Co. v. Wilmer, 97 Ala. 165, 168, 11 South. 886.

In that case (97 Ala. 169, 11 South. 887) it was further said:

"Moreover, it is not disputed that plaintiff was knocked off by or fell off the train in consequence of this jerk. This was itself some evidence for the jury that the jerk was unusually and negligently severe. It surely cannot be said to be usual or necessary to jerk a train into motion under any circumstances with such force and suddenness as to hurl employés from the top of it while they,·as the jury might have found plaintiff to be, are ordinarily careful and diligent."

These cases indicate that the production of sudden jars or jerks in the movement of trains may be held as· negligent only when they are violent enough to naturally and probably result in injury to some one on the train who is known to be, or to probably be, in a position of peril from such a movement; and when they are unnecessary under the circumstances of the particular case.

In W. U. T. Co. v. Howington, 198 Ala. 311, 73 South. 550, the complaint charged that plaintiff, a servant, while riding on a hand car operated in its service, was thrown violently over the front of the car to the ground by reason of the foreman's sudden and negligent application of the brake, whereby the speed of the car was suddenly slackened. The count was held defective for want of an averment that the foreman braking the car knew or should have known that the injured employé was in such a position that sudden braking would probably result in causing him to lose his balance and fall.

In the Howington Case it does not appear that any unusual or unnecessary means were used in reducing the speed of the handcar; the complaint being only that it was suddenly done without warning to the plaintiff. The ruling is therefore not in point here, though the situation is somewhat analogous.

In So. Ry. Co. v. Carter, 164 Ala. 103, 108, 51 South. 147, 148, where a switch engine was started suddenly (apparently by the usual means and without special jerking or jarring), it was said:

"Sudden start and resultant injury proven, the burden was, still upon the plaintiff to show that the engineer owed a duty to the plaintiff in the situation in which they were; in other words, to show that the engineer knew, or in the exercise of reasonable care ought to have known, that the plaintiff was in a position of peril when the engine was moved."

The case of Hunt v. C. B. & Q. R. Co., 181 Iowa, 845, 165 N. W. 105, L. R. A. 1918B, 369, is more nearly like the instant case than any to which our attention has been called. There the conductor of a freight train was thrown violently to the floor of the caboose while standing therein, as the result of a violent shock to the car which followed an application of the air brakes to the train, made by the engineer in order to bring the train to a stop at a tank to take on water for his engine. The conductor described the shock as the most violent he had ever experienced in seven years of railroad service. Said the court:

"That such a stop would result in a jerking more or less severe is a matter of such common knowledge as to have come practically within the range of judicial notice. The books are full of cases where negligence has been predicated upon the jerking of a freight train, and it has been held with practical unanimity that the jerking of a freight train, *even though severe and unusual*, is not of itself evidence of negligence as to employés operating the same. It becomes negligence only when the injured employé is known to be in a position of peril." (Italics supplied.)

To this proposition the court cites a long list of cases, including C. & O. R. Co. v. Walker, 159 Ky. 237, 167 S. W. 128, and Hedrick v. Mo. Pac. R. Co., 195 Mo. 104, 93 S. W. 268, 6 Ann. Cas. 793.

In the instant case we find nothing in the evidence tending to show that an emergency application of the air, if made, was an act of negligence, since it does not appear that it was unnecessary or unusual under the circumstances shown, or that it would have resulted in the injury suffered by the intestate had he been at his post of duty in the caboose, where the engineer had a right to assume that he was, and as to which he knew nothing to the contrary.

By whatever means the engineer stopped the train, whether by ordinary service applications of the air brake, or by an emergency application, the evidence is without dispute that he did stop it, as was intended and required, with the engine standing by the water tank, and that when the stop was thus made the caboose was necessarily at the eastern or Birmingham end of the bridge, a distance of approximately nine car lengths, or about 378 feet, from the pier on the western side of the river against which intestate's dead body was found. We therefore see no possible escape from the conclusion that, if intestate was in fact thrown from the train by reason of a jar or jerk imparted to it just before or at the time of its stopping he could not have been on the caboose, but must have been on one of the freight cars, on its top or clinging to its side, and that car must have been approximately the twentieth car away from the engine. If so, his presence there being not in the line of his duty, and unsuspected by the engineer, the action of the engineer cannot be held as negligent with respect to intestate's mishap.

[6] With respect to injuries suffered by employés in such cases as this, it is hardly necessary to observe, the doctrine of res ipsa loquitur does not apply, but the fact of negligence must be affirmatively shown. N. O. & N. E. R. Co. v. Harris, 247 U. S. 367, 38 Sup. Ct. 535, 62 L. Ed. 1167; Looney v. Met. R. R. Co., 200 U. S. 480, 26 Sup. Ct. 303, 50 L. Ed. 564; Williams v. Anniston El. & Gas

Co., 164 Ala. 84, 51 South. 385; Am. C., I. Pipe Co. v. Landrum, 183 Ala. 132, 62 South. 757.

[7] But, if it could be conceded that there is any tendency of the evidence to show the fact of negligence, the burden of proof was on plaintiff to show that the death of her intestate, due to his fall from the train, was the proximate result of that negligence, viz. the stopping of the train by an emergency application of the air brakes.

On the contrary, there is nothing in the evidence which supplies a basis for anything more than a plausible conjecture as to the cause and circumstances of intestate's fall and death. It may have resulted from a violent jar in stopping the train, as conceived by plaintiff. On the other hand—and the circumstances seem to favor such a conjecture—it may have resulted from an attempt by intestate to pass over the tops of the cars just as the train was starting after its stop at the tank, and his fall may have resulted from the jar of the starting, or from a careless misstep, or from a sudden dizziness. Or, as suggested by defendant's counsel, he may have left his caboose and the train temporarily, for some purpose of his own, and have fallen to his death in an attempt to catch up with and climb onto the train. Other plausible theories may be readily suggested. Whatever conclusion may be reached, it will rest upon speculation pure and simple—a choice merely of conjectures. This court has often declared that such a conclusion is not a proper basis for a verdict. Southworth, Adm'x, v. Shea, 131 Ala 419, 421, 30 South. 774; Scales v. C. I. & C. Co., 173 Ala. 644, 55 South. 821; Koger v. Roden Coal Co., 197 Ala. 473, 476, 73 South. 33; Miller-Brent Lumber Co. v. Douglas, 167 Ala. 286, 52 South. 414; Am. C. I. Pipe Co. v. Landrum, 183 Ala. 132, 62 South. 757, citing Patton v. T. P. R. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361; So. Sewer Pipe Co. v. Caraway, 182 Ala. 669, 62 South. 527.

As observed by Judge Labatt (4 Master & Servant, 4899, § 1604):

"As long as there is nothing more tangible to proceed upon than two or more conjectural theories, it is immaterial that the theory which is suggested in the interest of the servant is more probable than that which is suggested in the interest of the master."

The case of So. Pac. R. Co. v. Johnson, 69 Fed. 559, 16 C. C. A. 317, is strikingly like the instant case, and the opinion presents an excellent exposition of the subject.

From these considerations it results that the general affirmative charge should have been given for defendant, as requested in writing, and its refusal was reversible error.

For the errors noted, the judgment will be reversed, and the cause remanded for another trial.

Reversed and remanded.

ANDERSON, C. J., and McCLELLAN and THOMAS, JJ., concur.