(118 So. 758)

**CARRAWAY v. SMITH.  (6 Div. 171.)**

Supreme Court of Alabama.  Nov. 22, 1928.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellant.

B. F. Smith, of Birmingham, for appellee.

Brief did not reach the Reporter.

BROWN, J. This action is by the patient against the surgeon for alleged malpractice. The count of the complaint on which the case was submitted to the jury avers:

That "defendant held himself out as a surgeon, and as such undertook to operate and did operate upon the plaintiff for a broken or fractured leg, and to render medical treatment thereafter to plaintiff; that it then became and was the duty of defendant to exercise due care, skill and diligence in the setting, repairing and treatment of plaintiff's said broken leg, but notwithstanding said duty, defendant so negligently conducted himself in that regard that as a proximate consequence thereof *plaintiff's broken or fractured leg did not heal* and plaintiff was caused for a long time to suffer," etc.

The evidence is without dispute that the plaintiff, a child, was injured by being run upon by an automobile driven by one Frank, causing a transverse fracture of the femur of the right leg. Frank picked the child up and carried her to the hospital, where the defendant was called, or voluntarily undertook, at the request of some of the hospital attendants, to perform the operation of reducing the fracture—in common parlance setting the bone—and putting the leg in a plaster spica. This operation was performed by the defendant after having the injured leg X-rayed, and before and after the leg was put in the plaster cast it was examined through a fluoroscope, and it was then in proper alignment and position.

The child remained in the hospital until the day following the operation, when she was removed by her parents to their home in Rosedale, and Dr. Parker, the family physician, took charge of the case. After this the defendant was not consulted with reference to the case and had no further connection with it. About three weeks after the child was removed to the home of her parents, the plaster cast was removed by Dr. Parker and he found that the bone was out of alignment, but was firmly knitted together. He testified as a witness in behalf of the plaintiff:

"When I took the cast off of the leg it was short and crooked, and the cast loose on her leg. She was becoming emaciated considerably,

losing weight and losing flesh and shrinking. There appeared to be a lap in the bone in the leg called the femur, as best I could tell without an X-ray picture of it, and it indicated a slight angle in the position of about, I would say about that, a very slight lap. * * * When I took the cast off, it wasn't 'tight; it was loose here (indicating the lower leg), any looser than it should have been, but it was loose there where the break was. There could have been something else that caused the slipping out of joint. * * * The way that I have indicated the cast was fitted is the ordinary way in which to put casts on. There was nothing unusual about the manner in which they were put on and it was proper so far as I could tell. When I first saw it I didn't notice anything wrong with the cast or the leg either. The first time I saw it, it looked all right and one leg didn't appear shorter than the other. It was impossible to tell whether the cast was tight or not at the point of the fracture. But it was tight around—the portion of the cast that goes around the hips and body to hold to some slips. It was fitting closely. I couldn't see any looseness at the point of the fracture and couldn't tell anything wrong there. * * * When I first saw the child I saw nothing wrong with the cast or with the leg that I could tell. * * * When I noticed the cast becoming loose, I judged that the swelling was going out of the leg. This was a break of the bone between the thigh (knee) and the hip. * * * When you put the cast on, you have to fit the leg as swollen. You can't make it any smaller than the leg is at the time. At the time I noticed the cast was larger than the leg, if there was any swelling when the leg was first broken, it had come down. When I noticed this I advised him (the father of the child) to take the child back to the hospital, and he refused to do it. I first suggested taking it back to the man that put the cast on, and he refused to go back there. I then told him to take her to the Hillman Hospital, and he first refused to do that, but he finally went to the Hillman Hospital, I suppose."

Dr. Parker further testified that the child, while at the home of its parents—

"was lying on a cot with springs, a little cot as well as I can describe. It would sag towards the middle some. When I first saw that this cast was rubbing there, in my judgment, the irritation was partly due to the child moving, and to the discharges [from the kidneys and bowels]. I don't know of the child being taken across the room or moving out of the room during the time that I treated her. I didn't notice anything wrong in the length of the leg or in the arrangement of the cast until after the swelling had gone down *and then I noticed the slip.* * * * When I first saw the child with the cast on, up until the time I took the cast off of the little girl's leg, I had no opportunity or couldn't examine to see whether the leg was properly or improperly set. What indicated to my mind was that something was the matter, and that the cast ought to come off, was the fact that the cast was getting loose around the hip and that evidently it had drawn up. As to whether there was any indication that the leg might have been set wrong, I couldn't tell. It was impossible to say whether it was set wrong or not. * * * If the leg had been properly

set in the first instance, and the ends brought together and a proper union made of them, being in a cast wouldn't tend to shorten it. It would take something else to do that, it was the child moving."

The charts showing the diagnosis of Dr. Roberts, a specialist in bone surgery, who performed the second operation, offered by the plaintiff, and shown to be authentic by the testimony of Dr. Roberts, go to show that, when the child was carried to the Hillman Hospital for the second operation, she showed—

"an outward bowing of the right upper thigh, right lower extremity two inches further than the left. Firm union of fracture. X-ray shows an old fracture upper one-third of right femur with about 1½ inches overlapping of fragments. Sufficient callous, sufficient new bone."

And Dr. Roberts testified:

That the bone was firmly united, and the new bone had enlarged; that this enlargement of the bone would take up what the swelling did. "As to whether there is no danger of slipping it by a slight receding of the first swelling, there is always danger of a thigh bone slipping. * * * The idea of putting the cast up around the waist is to hold it firmly and keep it from slipping. As to whether, if it is put on properly, it ought to stay there until the time to take it off, to hold the leg secure, we put it on and hope it will stay there. It don't generally stay with my cases. They sometimes slip, and I can't help it. As to the chances of it slipping when put on under these circumstances, that would be a pure guess. I should say that probably 50 per cent. slip from the best you can do with them. When they slip, the chances are that you will get a slight bit of shortness of the limb. You can't help it. * * * In 10 days after it has been set it would be grown together some, but it would not be enough to hold in 10 days. I don't mean hold it so that he can stand on it. I mean to keep it from slipping. * * * To keep a fractured thigh bone from slipping is about the hardest problem we have. I will explain to the jury why it is more difficult to keep a thigh bone from slipping and what makes it slip. We have only one bone to deal with, and the end of a fractured bone is just as slick as ice. It is covered with blood and very slick, and the muscle —pull, of course there is irritation of the muscles, and with any irritation they always contract, and they are very powerful muscles in the thigh, and those muscles keep on acting for several days until they get tired out. During that time the muscles pulling are liable to pull the ends of the bone off. * * * If the child is moved, I think the chances are added to the bone getting out of place. * * * I don't know anything except the condition in which it came to me at the Hillman Hospital. I don't know whether the bone was set properly, or slipped, or not, and have no way of telling. I don't mean to tell the jury that the bone wasn't set prop-

erly in the first instance and slipped. I can't say that. I don't know."

This evidence presents the case in its most favorable light to the plaintiff, and the sole hypothesis on which it was submitted to the jury was negligence on the part of the defendant in reducing the fracture and applying the plaster cast, and to this end the jury was instructed that, if they "were reasonably satisfied from the evidence that the plaintiff's thigh bone was properly set by Dr. Carraway and the cast properly applied," their verdict should be for the defendant. The only fact established by the evidence, or which it in any way tends to establish, on which a contrary conclusion could be reached, is that, when the plaster cast was removed, the bone fragments were out of alignment, showing a slight lap and a shortening of the leg. This, as the evidence shows, may have resulted from one of several other causes than negligence in reducing the fracture and applying the cast to wit: The removal of the child from the hospital by its parents soon after the operation was performed, and for which the defendant was in no way responsible; the reduction of the swelling, a natural physiological effect of the healing process, which loosened the support of the plaster cast; and the contraction of the muscles in the leg from the irritation causing the fragments to slip, or the moving about of the child in bed before the bone had sufficiently united to resist the contraction of the muscles—presenting nothing stronger than a mere plausible conjecture, which is not sufficient to meet and carry the burden of proof resting upon the plaintiff, to show that the result complained of was proximately caused by the negligence of the defendant. Moore et al. v. Smith, 215 Ala. 592, 111 So. 918; Southern Ry. Co. v. Dickson, 211 Ala. 481, 100 So. 665; St. L. & S. F. R. R. Co. v. Dorman, 205 Ala. 609, 89 So. 70; Smith v. Eudy, 216 Ala. 113, 112 So. 640.

Moreover, the complaint ascribes plaintiff's damages to negligence on the part of the defendant in "the setting, repairing, and treatment of plaintiff's said broken leg; * * * as the proximate consequence thereof plaintiff's broken or fractured leg *did not heal;*" and as to this there is clearly a failure of proof.

We are of opinion, therefore, that the court erred in refusing the affirmative charge requested by the defendant, and for this error the judgment must be reversed.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and THOMAS, JJ., concur.