(121 So. 539)

## McKINNON v. POLK. (6 Div. 321.)

Supreme Court of Alabama. April 4, 1929.

Fort, Beddow & Ray, of Birmingham, for appellant.

Hugh A. Locke, of Birmingham, for appellee.

THOMAS, J. The suit is for personal injury alleged to have been negligently caused by the treatment of plaintiff's physician. The rules given application to such action need not be repeated. Robinson v. Crotwell, 175 Ala. 197, 57 So. 23; Talley v. Whitlock, 199 Ala. 28, 73 So. 976; Knowles v. Blue, 209 Ala. 27, 95 So. 481; Knowles v. Dark & Boswell, 211 Ala. 59, 99 So. 312; Moore v. Smith, 215 Ala. 595, 111 So. 918; Peck v. Henderson, 22 Ala. App. 541, 118 So. 262; Carraway v. Smith, 218 Ala. 412, 118 So. 758; Carraway v. Graham, 218 Ala. 453, 118 So. 807.

The burden of proof was upon the plaintiff to show the negligence charged, and that it proximately caused the wrongful condition and injury for which the suit was brought. Moore v. Smith, 215 Ala. 592, 111 So. 918; Carraway v. Smith, supra; Morgan Hill Paving Co. v. Fonville (Ala. Sup.) 119 So. 610.[1] The application of res ipsa loquitur is not made in such a case. The proof must go further than merely show that an injury could have occurred in an alleged way—it must warrant the reasonable inference and conclusion that it did so occur as alleged—and the inference merely that it could so occur does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause. Southworth v. Shea, 131 Ala. 419, 30 So. 774; Carraway v. Graham, supra; Southern Rwy. v. Dickson, 211 Ala. 486, 100 So. 665; Mobile Light & R. R. v. Roberts, 192 Ala. 486, 68 So. 815; Central, etc., Co. v. Alabama Co., 204 Ala. 41, 85 So. 738; St. Louis, etc., Co. v. Dorman, 205 Ala. 609, 89 So. 70.

Appellant limits his assignment by the statement that all errors on the record are waived, except that for the refusal to give the general charge, and that of the refusal to grant the motion for a new trial.

The complaint charges that defendant conducted himself as her physician in such a negligent and unskillful manner in and about the performance of medical services upon plaintiff, and as a "proximate consequence thereof her womb became infected and she contracted blood poisoning therefrom." Does the evidence contained show a state of facts from which it may be reasonably inferred that plaintiff became so infected by reason of the negligence or unskillful treatment or the lack of ordinary care and skill of the defendant as her physician? He was called and administered or treated her within the period of an existing illness. The material inquiry of fact is whether or not the plaintiff was suffering from blood poisoning before and when the physician was called, or did she become infected by his improper treatment, or by reason of the lack of the required proper treatment and skill on defendant's part, after he was called as a physician to her bedside.

The rules of good pleading and evidence necessary to a recovery are: (1) A duty owing from defendant to plaintiff in the particular circumstances of the case; (2) a negligent performance or negligent failure to perform that duty; which resulted in (3) injury to plaintiff as a proximate consequence thereof.

In Western Rwy. of Ala. v. Mutch, 97 Ala. 194, 11 So. 894, 21 L. R. A. 316, 38 Am. St. Rep. 179, this court declared that to constitute actionable negligence there must be not only a "causal connection between the negligence complained of and the injury suffered, but the connection must be by a natural and unbroken sequence—without intervening, efficient causes—so that but for the negligence of the defendant the injury would not have occurred; it must not only be a cause, but it must be the proximate [cause]; that is, the direct and immediate efficient cause of the injury." This rule of actionable negligence has been adhered to in this jurisdiction. Morgan Hill Paving Co. v. Fonville, supra; Armstrong v. Montgomery Street Rwy. Co., 123 Ala. 233, 26 So. 349; M. & O. R. Co. v. Christian M. Brew. Co., 146 Ala. 404, 41 So. 17.

The motion for a new trial and affirmative instruction denied are argued together. The respective rules that govern (Cobb v. Malone, 92 Ala. 630, 9 So. 738; McMillan v. Aiken, 205 Ala. 35, 40, 38 So. 135; Morgan Hill Paving Co. v. Fonville, supra) need not be repeated.

There are important facts to be considered, as that, before the call of defendant as plaintiff's physician, she was subject or affected by some positive cause (as disease, injury, or infection, etc.) that produced an abortion or miscarriage; that she had suffered or experienced former miscarriages; that immediately preceding said illness she had visited Birmingham and before her return was afflicted with flooding or symptoms that attend a miscarriage and did abort after she returned to her home in an outlying village in Jefferson county; that because of this flooding, fever, and the attendant ills and danger with which she suffered, the defendant was called as physician; after observation and interrogation of the patient he diagnosed her condition as that of miscarriage or abortion and immediately administered the required treatment thought by him to be necessary; he requested a woman who was present to thoroughly cleanse the outward parts of the patient, while he thoroughly sterilized his hands and the gauze required and used in packing the inner parts in order to check or stop the flow of blood and give nature a chance to cleanse the patient's womb; that defendant only used his fingers for vaginal examination and packing; did not dilate or

[1] 218 Ala. 566.

enter the womb at any time, or touch the same with his fingers, other than covered by the thoroughly and properly sterilized gauze with which the packing was made.

It is further testified by these professionals that the womb may become infected from many causes, whether sterilized rubber gloves or sterilized hands are used; that the womb cannot be entered with the fingers without dilation; and that plaintiff's womb was not dilated in examination or treatment; that physicians in that community used sterilized fingers in making vaginal examinations and packing. These professional witnesses, or more than one of them, gave evidence to the effect that it was not considered improper, after the use of a hot lysol solution, in the thorough sterilizing of the hands and the gauze to be used as packing, "to insert and pack the same with the fingers without gloves." More than one of these professional witnesses stated that "for the purpose of making a packing and inserting it [the gauze] in the vagina," he [they] did not think that would be [an] improper practice, "though witness usually used gloves, and the best authorities recommend the use of gloves; that the gloves were as much for the protection of the physician "as any other purpose"; that the physician can make "examinations sometimes better without gloves than he can with them—better with my [the] naked fingers."

The testimony of the defendant was that in his examination and treatment his "fingers were not within two inches of the cervix," the narrow lower end of the womb; that, when he removed the afterbirth, he employed as gentle a "pull on it as it would stand without tearing," and by this means he removed the same; that it was ragged, jagged, and elongated, showing, as he said as a professional about such matter, that the afterbirth had been torn loose from its physical mooring for some time preceding its removal; the condition, he observed, showed an abortion of "say a ten weeks' pregnancy," at which stage the naval cord should be about twelve inches long; that, if the foetus and said cord were expelled before the defendant was called in, the plaintiff knew it; that the afterbirth removed by defendant contained no "vestige of the naval cord."

The plaintiff stated on cross-examination that she did not know she had a miscarriage; told her sister that the doctor seemed to think it was a miscarriage. Plaintiff had stated on her direct examination:

"When he got there he asked me my condition and symptoms and I told him. He said, 'Well, we will have to pack you; I don't see anything else to do;' and he asked me did I think I was pregnant, and I said, 'I don't know, that is for you to find out;' and I told him if he thought I was to go ahead and clear me out and get through with it; that I was afraid of the blood poison that could happen. * * *

"After he started packing me something hurt me, and I said, 'You have cut me with your finger nails;' and he laughed, and said, 'No, I haven't;' and I said, 'Where are your gloves;' and he said, 'I can't be bothered with them.' He was using two fingers the best I could tell. It felt like he was scratching me with his middle finger. He didn't stop then and get any gloves. * * * The second time he packed me was the next night. He did not use gloves then. He packed me the next night; this packing had come out before he got there. It come out every time. It came out itself; there was no removal of it. When this came out he examined what was in it, and said, 'Well, we had better see about that.' He went in there and got what he called a formation. That was the third time he was there. I mean by that, life. That was Sunday night, and he packed me again after that night. That came out the next day, Monday. * * * I told him that something had to be done, and I knew I had blood poison and he laughed about it, and said 'No, you haven't;' and I said, 'I know I have;' and he said he would see about that, and he went in and got what he said was afterbirth. * * *

"I didn't mention one until I needed one, and he stayed off from work and got him. I don't remember whether Mrs. Smith was up there on Friday or not. I don't know whether I told her I had fever of one hundred and two or three or not but she knew at the time I always had fever. I don't remember whether she and I discussed the fact that I had fever. I don't remember that we discussed that I had had fever two or three days."

And Mrs. Burrough testified, among other things, that plaintiff said of the first doctor prescribing for her (not the defendant) that:

"She said she had been to town and had seen a doctor and he had given her a tonic because she had gone to find out whether she was pregnant or not; 'whether anything was the matter with her' were the words she used. That was on Saturday. She said the doctor told her there was nothing the matter with her but a shock. * * * I went over to see what I could do for her. She was barely able to talk; talked in a whisper. That was before any doctor had come. Wednesday she had a high fever. * * * She had a burning fever on Wednesday. On Friday she told me she had just had a chill, and she had a fever when I was there. She told me on Friday before the doctor came she had fever. * * * She seemed to think she was going to die the whole way through. She told me about a miscarriage first that night, Friday night. That was before the doctor came."

And Dr. Ussery, who treated plaintiff in the hospital, testified:

"It is the ordinary accepted practice at the

present time when a person goes into the uterus to use gloves. Personally, I think it is best not to go into the uterus without gloves. I think that is the accepted practice at the present time. Whenever any instrument, even the most sterile, is inserted through the birth canal or birth tract, inserted through the vagina into the uterus, that does not always create a certain amount of infection. It may, but not always."

. There is a lack of evidence that defendant went into the uterus. The physicians who testified in response to the hypothetical questions propounded all agree that plaintiff was suffering from septicæmia—blood poisoning—when defendant was called to her bedside. Dr. Ussery stated he would suspect blood poisoning, and Dr. Mitchell stated that, if she was already so infected, under the given conditions he did "not think you could infect her." He states his medical opinion as follows:

"If blood was flowing over my hand from the womb, and I had used disinfectant in inserting the gauze to stop the flow I would not consider it possible for her to become infected by me taking my sterilized fingers and inserting the packing. I would think she had the infection already. I don't think I would infect it any more. With proper sterilization of the hands I don't think you could infect her."

Not one of the expert witnesses gave evidence that reflected upon or criticized the diagnosis or treatment by defendant as improper. The plaintiff rests her case upon defendant's use of his naked fingers, rather than the gloves, in inserting the packing in the vagina to check the flooding. The testimony of Dr. Ussery was that he thought it best not to go into the "uterus without gloves," and there were text-books introduced to the same effect.

Defendant denied that he ever entered the uterus, and only extended his two fingers *into the vagina* and not to or *into the uterus.* Plaintiff had been sick almost a week before the defendant was called; had taken douches and treatments, and treated herself as best she could; this was done with a knowledge of her two prior miscarriages and their attendant needs, difficulties, pains, and dangers. Defendant did not, by special contract, guarantee to plaintiff that he would cure her ills. The burden was upon plaintiff to reasonably satisfy the jury from the evidence that defendant was negligent in his duty and treatment to her; that he did not use that degree of care and skill in his treatment of her which the law imposed upon him as a physician in the community in question; that such negligence was the direct and proximate result of his failure of duty in the treatment of plaintiff; and that by reason thereof she suffered the injuries set up in her complaint.

As stated, she is not aided by the rule of res ipsa loquitur. Moore v. Smith, supra. It is a matter in which the jury should have been largely controlled by the expert testimony of physicians in that locality, rather than the testimony of plaintiff; that is to say, "In a peculiar sense [it was] one to be decided on the expert testimony." Carraway v. Graham, supra.

In Carraway v. Smith (Ala. Sup.) 118 So. 758,[1] the court recently observed, of actionable negligence in a case against a physician and the discharge of the burden of proof, that, where the evidence presented nothing stronger than a mere plausible conjecture, it was not sufficient to meet and carry the duty resting upon the plaintiff to show that the result was proximately caused by the alleged negligence.

And in Carraway v. Graham (Ala. Sup.) 118 So. 807, 814,[2] is the just observation that, if the physician exercised reasonable care and skill, he is not liable for error of judgment in diagnosis and treatment, when the proper course is the subject of reasonable doubt, and there was a just observation and due warning to the courts as to the great care that should be exercised in such cases to protect honest and capable medical men in a proper case.

Proof which goes no further than to show that the injury *could have* occurred in the way alleged "does not warrant the conclusion that it *did so occur*," when the proof of injury "can with equal probability be attributed to some other cause." Southworth Adm'x v. Shea, 131 Ala. 419, 30 So. 774.

We are of opinion that the womb of plaintiff did not "become infected" as alleged, but had been immediately theretofore infected and was so infected when defendant treated her, and that there is no causal connection between the alleged negligence and injury alleged to have been suffered.

The affirmative charge should have been given.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.